UNITED STATES, Appellee

v

AUGUST E. SNOOK, JR., Private First Class,
U. S. Army, Appellant

12 USCMA 613, 31 CMR 199

614

No. 15,153

January 26, 1962

 

*Captain Samuel Rozel* argued the cause for Appellant, Accused. With him on the brief were *Thomas C. Lancian, Esquire, Colonel W. H. Black-marr,* and *First Lieutenant Robert D. Stiles.*

*Captain Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *Major Francis M. Cooper.*

## Opinion of the Court

QUINN, Chief Judge:

On Thanksgiving Day, November 26, 1959, military policeman R. J. Smith was killed by a bullet from his own gun. Investigation led to a charge of premeditated murder against the accused. After a three-day trial before a general court-martial in Germany, the accused was convicted of unpremeditated murder and sentenced to a dishonorable discharge, confinement at hard labor for twenty years, and accessory penalties. Intermediate appellate authorities affirmed the conviction. Thereafter, the accused appealed to this Court alleging ten grounds of error.

We turn first to the contention that the findings of guilty are not supported by the evidence and that the charge must be dismissed. There were no witnesses to the shooting. The victim never talked; and the accused's account of the incident comes only from a statement he made to a criminal investigator five days after the shooting. It appears that the accused spent the day at the home of Sergeant Miller in the Vogelweh housing area. He arrived about 11:30 a.m. and departed about 11:15 p.m., presumably for his barracks. During his stay the accused consumed a considerable quantity of German beer. At about 11:35 p.m. several witnesses observed a military police jeep at the intersection of Third Avenue and Hohenecken Road in the Vogelweh area, which was about one-quarter mile from Sergeant Miller's apartment. They saw a man, who appeared to be drunk, standing in front of the jeep; a military policeman was with him. Another witness testified that about the same time and in the same area he saw a man bending slightly from the waist with his arms "stretched out in front of the jeep" between the headlights. A military policeman stood two or three feet behind him. Between 11:25 and 11:35 p.m. Sergeants Fleming and Hamby left a dinner party at an apartment in the housing area. As they "pulled up" to the stop sign at the corner of Third and Connecticut Avenue, a distance of about 250 yards from the intersection of Third Avenue and Hohenecken Road, they noticed an enclosed jeep at the stop sign on Third Avenue. The jeep suddenly began to "jump backwards." Fleming turned from Connecticut onto Third Avenue. As his vehicle approached the jeep, which was rolling backward on the downgrade of Third Avenue in the di-

**615**

rection of Hohenecken Road, he and Hamby saw an arm protruding from the open right door. Fleming stopped. The occupants of his vehicle ran over to the jeep. A military policeman was "slumped over the seat from left to right, and his right arm was hanging out of the jeep." Hamby moved the policeman's foot to engage the foot brake. He then moved the shift, which he found in high gear, to reverse gear. Hamby, a psychiatric technician at the 2d General Hospital, examined the jeep driver and "couldn't find a pulse." A pistol dangled on the outside of the right door, on a lanyard attached to the policeman.

The policeman was Smith. An autopsy indicated he died of a bullet wound. The bullet "probably" entered his body at a point just to the right of the mid-portion of his chest; it pierced the heart, tore a hole in the lower left lung, and went out on the left side. The pathologist who performed the autopsy testified that death occurred "very quickly" after the entry of the bullet into the heart. He said that on the missile's impact there would be a "large spurt of blood" through the opening in the chest which would travel a "considerable distance." When Smith's body was brought to the medical dispensary, it was observed that his hands were encased in leather gloves.

A search of the Third Avenue roadway led to the discovery of an expended cartridge case, which a ballistic expert testified bore markings indicating it had been fired from Smith's gun. A shoe was also found. It had markings indicating it belonged to the accused. A pass made out to the accused as a member of the 83d Transportation Company, his previous organization, was found in Smith's outside jacket pocket. Further investigation disclosed that the accused's jacket and trousers had blood stains on the left side. Analysis showed the stains were made by type O blood. This was Smith's blood type. The accused's blood type is type A1. A soil sample taken from the Third Avenue area near some blood spots found on the roadway was "similar" to a soil specimen found on the inside of

the right front of Smith's jeep. Both of these specimens were "identical" to soil scraped from the shoe found at the scene of the shooting. As previously noted, the accused made an oral statement to an investigator five days after the shooting. The agent's testimony is as follows:

"A. All right, sir; he said it was an accident. He said that he had been picked up by Smith, that he didn't know where; if he remember [sic] right, it was on a hill someplace. He didn't know if the jeep was in motion or was stopped, but he asked to be let out to urinate.

"Q. That's not what he said.

"IDC: Objection.

"LO: Objection sustained. But I will instruct the witness that he will use, if he remembers, the exact words.

"A. Yes, sir, he said he had to take a piss. He said he either climbed out of the jeep or fell out, he didn't remember. He told me he had a sore hip. He told me he must have fell out. He says when he started to get up from the ground, he then started to get back into the jeep, after Smith had directed a few statements to him —he didn't recall exactly what—but words to the effect, 'Get back in here, or get back in this jeep,' he saw the gun. When he saw the gun he thought he was going to get shot. He became excited and he grabbed the gun. All he recalled after he grabbed the gun was that he heard the MP scream and nothing else. He don't remember running through the woods or returning to his barracks. He did not hear the shot. At that time he asked to be excused because he felt tired and he wanted to go lay down, and his request was granted. At no time did Snook request a defense counsel.

* * * * *

"Q [IDC]: Did Snook tell you anything about the position of the gun when he first saw it?

"A. Yes, sir, he did.

"Q. What did he say?

"A. He said he thought Smith was leaning over toward the co-driver's

seat in the jeep. He said he thought the gun was out of the jeep, or he didn't know if the gun was in or out —I don't recall exactly.

"Q. Did he say anything about the gun being in Smith's hand?

"A. Yes.

"Q. And did he say that it was pointed at him?

"A. Yes, he said that's why he became afraid.

"Q. And then, according to your testimony, he said he grabbed the gun?

"A. Yes, sir.

"Q. Did he say why he grabbed it?

"A. No, sir. He told me earlier that he was afraid he was going to get shot, and after that he told me that he grabbed the gun.

"Q. Did he tell you why he grabbed the gun?

"A. No, sir."

Several other matters in evidence merit mention. It was shown by the defense that an examination of the accused's blood about 5:15 a.m. on November 27 disclosed an alcohol level of 1.1 milligrams per cubic centimeter whole blood. A psychiatrist testifying for the defense said in response to a hypothetical question, predicated upon matters in evidence and a psychiatric examination of the accused, that in his opinion the accused at the time of the incident "could not evaluate properly his environment," and while he "could act with cunning and . . . could reach certain conclusions" he was "not capable" of forming a premeditated design to kill. The witness further testified that accused's "scruples" are very little pronounced, and that "he is prone to violence." A laboratory examination of the pistol showed "no fingerprints . . . with sufficient ridge detail for identification purposes." Paraffin casts of the accused's hand were made on the morning of November 27; these and Smith's gloves were subjected to derma-nitrate tests, but the results were negative. An expert witness testified these tests "are not conclusive" because nitrate residue may or may not adhere to the hands when a pistol is fired. He also said that the residue can be washed away.

Stressing the absence of a plausible motive on the part of the accused to take Smith's life, appellate defense counsel contend the evidence shows that Smith's death could reasonably have resulted from an "unfortunate accident and innocence," and, therefore, it is insufficient to establish guilt beyond a reasonable doubt. The argument disregards the accused's own account of the incident and many of the physical facts. True, the accused described the shooting as an "accident," but there was patently no accident in the sense that the weapon fell out of the holster and struck something which caused it to discharge, as hypothesized by the dissenting member of the board of review, or that in some other fortuitous manner the pistol discharged without any human agency. The accused's statement leaves no doubt about the general circumstances under which the gun was discharged. It went off during a struggle with the military policeman, a struggle which the court-martial could reasonably find was precipitated when the policeman tried to prevent the accused from attempting an escape.[1] The discharge of the weapon in the struggle might have been unintentional, or as the accused said "accidental," in the sense that neither of the participants intended to discharge the weapon, or, alternatively, the trigger might have been deliberately pulled by the accused. The pistol was not, as appellate defense counsel maintain, completely free of fingerprints. Defense Exhibit A, a stipulation of the results of the laboratory report, is only to the effect that no fingerprints were found with sufficient ridge detail for identification. The clear intimation is that fingerprints were present on the pistol, but that they were unidentifiable. The accused's pretrial admission strongly in-

---

[1] The conclusion is firmly supported by the evidence of the soil comparison and the accused's statement that when he got out of the jeep he was ordered back in by Smith and that he actually started to get back into the jeep.

dicates they were his. He said, it will be recalled, that he "grabbed" the gun. The truthfulness of the accused's admission is strongly supported by the fact that the victim wore gloves.

With the gun in the accused's hand, the court-martial could consider his pretrial admission that he was "excited"; it could consider the meaning of the admission in the light of the defense psychiatrist's testimony that the accused had little scruples and was prone to violence, especially when in an intoxicated state; and it could also consider the accused's flight from the area as evidence of a consciousness of guilt on his part. Edmonds v United States, 273 F2d 108 (CA DC Cir) (1959). On the basis of this evidence, the court-martial could reasonably conclude the accused pulled the trigger after he wrested the pistol from Smith. There is, therefore, sufficient evidence to support the findings of guilty of unpremeditated murder. United States v Judd, 10 USCMA 113, 27 CMR 187; Arpan v United States, 260 F2d 649 (CA 8th Cir) (1958).

We turn next to several challenges to rulings by the law officer. At the close of counsel's final arguments, which included argument by both individual defense counsel and appointed military counsel, individual defense counsel requested leave to make a one-sentence statement "in the nature of a reply to the prosecutor." The law officer denied the request. Paragraph 72a of the Manual for Courts-Martial, United States, 1951, provides in part that if trial counsel introduces "new matter" in his closing argument, the defense "should be afforded" the opportunity to reply. Appellate defense counsel does not contend that trial counsel introduced any new matter in his closing argument. Perhaps, as the defense contends, there should be "relaxation" of the rule in a case as serious as this, but the matter raised was within the sound discretion of the law officer. Considering the privilege he extended to the defense for a double argument, he did not abuse his discretion by denying further argument, even though the

**618**

request was for a "one sentence additional statement."

At the beginning of the trial, the defense moved to dismiss the charge on the ground that, in violation of Article 10 of the Uniform Code, 10 USC § 810, the Government did not immediately advise the accused of the "specific wrong" with which he was charged. The motion was denied. Article 10 provides in part that when an accused is in arrest or confinement "immediate steps shall be taken to inform him of the specific wrong of which he is accused." About 4:25 on the morning of November 27 the accused was informed he was "under apprehension." At the same time he was told that he was suspected of "murder." On the afternoon of the 27th the accused was confined in the stockade. The next day, he was served with a formal charge sheet alleging unpremeditated murder. A new charge alleging premeditated murder was preferred on January 21, 1960. The accused was informed of this charge on January 22. It clearly appears, therefore, that he was sufficiently informed on each occasion of the specific wrong with which he was charged. There is, therefore, no merit in this claim of error.

A second defense motion to dismiss the charge was predicated on the ground the accused was denied a speedy trial. Over four months elapsed between the accused's arrest and April 5, 1960, the first day of trial.[2] On February 29 the Government advised defense counsel that the case was set down for trial on March 8. The defense requested delay until March 29 because it needed "additional time to prepare a defense," and to allow individual counsel to go to the United States for a "court commitment." At trial, however, the defense represented that it had been ready for trial since the latter part of January and it was prejudiced because "certain witnesses who might have

_____

[2] For the purposes of this assignment of error, we treat the original and the superseding charge as one.

been of assistance [as character witnesses] . . . [were] redeployed."

The defense admitted that in December 1959 it still did not know the "entire scope" of the case, and it was "impossible" to determine what witnesses it would call. In a letter dated January 21, the accused wrote his commanding officer requesting release from confinement pending disposition of the charge against him or a "quick trial." He said nothing about the departure of possible witnesses, but gave as the reason for his request the fact that confinement was "effecting [sic] . . . [him] physically and mentally." There is no indication when the persons claimed to be potential character witnesses departed from the command and there is no showing that the defense ever requested these persons be detained, or called as defense witnesses. See Article 46, Uniform Code of Military Justice, 10 USC § 846; United States v Harvey, 8 USCMA 538, 25 CMR 42. Finally, it appears that the original charge of unpremeditated murder was based upon a fragmentary report of the incident. There was reconsideration of the charge by the accused's commander and a new charge was prepared on January 21, 1960.

Considering the serious nature of the charge and the steps taken to prosecute it, and the admitted general unreadiness of the defense, the law officer did not abuse his discretion in concluding that the accused was brought to trial with "reasonable dispatch." United States v Callahan, 10 USCMA 156, 27 CMR 230. Cf. United States v Brown, 10 USCMA 498, 28 CMR 64.

An incident which occurred at the conclusion of the law officer's instructions is made the basis for an attack on the validity of the findings. The record of trial shows the following:

"LO: Gentlemen, does the court have any request for further instructions?

"PRES: At this point, no. In view of the complexity of the case and the great amount of discussion we have heard, the court would prefer to adjourn or recess until 0900 hours tomorrow.

"LO: Gentlemen, I'm afraid, under those circumstances, I would have to ask you to be confined in one place with a guard. This case is too important to allow the court to be separated, while the Army makes no provision whatever for keeping courts together, never has. I believe in such a case, important as this one is, that the evidence which has been in the newspapers and in which you may have found certain evidence, that I would be inclined to keep the court together until 0900 o'clock tomorrow morning, if that's what you want. Gentlemen, I think it might be well, before I hand you the work sheets, that you take a short recess, and we'll probably get into an out-of-court hearing with the counsel before I make a final ruling.

"PRES: We'll wait . . . I think we'll go along with your recommendations.

"LO: Now, of course, if you can't reach a decision at this time, it's something we ought to take up at that time.

"(The court recessed at 1600 hours, 7 April 1960.)

"PRES: The court will come to order.

"(The court reconvened at 1635 hours, 7 April 1960.)

"PRES: Private First Class Snook, it is my duty as president of this court to inform you that the court in closed session and upon secret written ballot, two-thirds of the members present at the time the vote was taken concurring in each finding of guilty, finds you:

"Of the Specification and Charge: Guilty, except the words, 'with premeditation', of the excepted words, not guilty. Of the Charge: Guilty."

As provided by the Uniform Code of Military Justice, Article 54(a), 10 USC § 854, the president and the law officer authenticated the record of trial, with individual defense counsel certifying that he had "examined" it. When the case came up for review before the board of review, appellate de-

fense counsel assigned as error the apparent fact that the deliberations on the findings took place during a recess of the court. See United States v Solak, 10 USCMA 440, 28 CMR 6. In response to the assignment, the Government initiated an inquiry concerning the correctness of the record. In due course, a certificate of correction of the record of trial was filed with the board of review. The certificate recites that in fact the court closed to deliberate on the findings, and that the reporter had mistakenly noted that it "recessed" and later "reconvened," when he should actually have reported that the court "closed" for deliberations on the findings, and "reopened" to announce the findings. The certificate of correction was signed by two members of the court "in lieu" of the law officer and the president "because of . . . [their] absence." The certificate was also signed by appointed military defense counsel and civilian defense counsel.

The record of a general court-martial is ordinarily authenticated by the president and the law officer. ▉▉▉▉▉▉▉ ▉ However, other members of the court may act in lieu of the president and the law officer when they are "unavailable" by reason of "death, disability, or absence." Article 54(a), supra. In an informative and well-reasoned argument, appellate defense counsel emphasize the importance of having the record of trial authenticated by the president and the law officer, but we cannot accept their conclusion that Congress intended the word "absence" to mean an absence only by reason of "missing in action or otherwise unaccounted for." We need not define the precise meaning of the word as used in Article 54(a) because it unquestionably includes physical absence from the jurisdiction. Cf. United States v Bunting, 4 USCMA 84, 88, 15 CMR 84. That the law officer and the president were in fact absent from the jurisdiction so as to authorize other members of the court-martial to authenticate the certificate of correction in their stead is not disputed. Nor is the truthfulness of content of the certificate disputed. Consequently, the certificate properly reflects the true proceedings at the trial. United States v Galloway, 2 USCMA 433, 9 CMR 63. The corrected record of trial definitely establishes that the court-martial considered the findings during a closed session for that purpose, and not during a recess.

Aside from the circumstances under which the findings were reached, the accused contends the quoted colloquy shows the law officer did not give the findings work sheet to the court members in open court. There is no doubt that the work sheet was utilized by the court-martial. It is quite apparent it was given to the court members at some time. The failure of the record to show the exact time does not mean the record is deficient in a material respect. The work sheet bears the president's signature and is appended to the record of trial as an appellate exhibit. In these circumstances, it is distinctly arguable that it was properly used by the court. United States v Walker, 1 USCMA 580, 5 CMR 8; see also United States v Kupfer, 3 USCMA 478, 13 CMR 34. In any event it contains nothing prejudicial to the accused. Thus, even if we assume it was passed to the members outside the regular recorded proceedings, it did not adversely influence the court-martial to the accused's prejudice. United States v Allbee, 5 USCMA 448, 18 CMR 72.

In a final argument on the effect of the colloquy, the accused contends it coerced the verdict. See United States v Solak, supra; Cook v United States, 254 F2d 871 (CA 5th Cir) (1958). The contention is based on the law officer's statement that he would keep the court members together overnight if they wanted to recess until the morning before deliberating on the findings. Whether the triers of the facts should be kept together after the case has been submitted to them for verdict is a matter within the sound discretion of the trial judge. The discretion is abused if court members are required to remain together an inordinate amount of time as a means of compelling a decision. United States v Solak, supra. No such abuse appears

in this record. On the contrary, the president clearly concurred in the law officer's opinion on the advisability of keeping the court members together, and immediately accepted his implied suggestion that the court deliberate rather than recess. The stated and obvious purpose of the law officer's remarks was to impress the court members with the necessity of remaining insulated from extra-record influences. There is not the remotest hint the court members would be forced to remain together beyond the time required to determine whether they could or could not reach a verdict.

We have examined the remaining assignments of error and find nothing in them to indicate that any substantial right of the accused was prejudiced. Accordingly, we affirm the decision of the board of review.

Judges FERGUSON and KILDAY concur.