UNITED STATES, Appellee,

v.

Robert N. MULDOON, Private First Class, U. S. Army, Appellant.

No. 37,562.
CM 437688.

U. S. Court of Military Appeals.

Feb. 9, 1981.

1. This tip was somewhat corroborated when the informant correctly listed some of the items that had been taken during the break-in—items about which he said he had learned from Per-

Appellant: *Major Carlos A. Vallecillo* (argued); *Colonel Edward S. Adamkewicz, Jr., Captain William J. Carter* (on brief).

Appellee: *Captain Eugene R. Milhizer* (argued); *Colonel R. R. Boller, Major David McNeill, Jr., Captain Stephen D. Smith, Captain Rexford T. Bragaw, III* (on brief).

Opinion of the Court

EVERETT, Chief Judge:

Tried and convicted by a military judge of larceny and housebreaking, in violation of Articles 121 and 130, Uniform Code of Military Justice, 10 USC §§ 921 and 930, respectively, the appellant was sentenced to a bad-conduct discharge, confinement at hard labor for one year, total forfeitures, and reduction. All intermediate reviewing authorities subsequently upheld his conviction. We then granted review to determine whether the appellant's confession was illegally obtained and should have been suppressed as evidence by the military judge.

I

A confidential informant reported to Special Agent Coates of the Criminal Investigation Division (CID) that he had heard one Perdue state how he and two fellow soldiers—Fletcher and the accused—had recently broken into the Badnerhof NCO Club.[1] Coates, who was assigned to the CID Resident Agency in Heilbronn, related this information to his superior, Special Agent Daniels.

On the basis of this information Daniels directed that the three soldiers be apprehended. Special Agent Shanley, from whom Daniels had just taken over as agent-in-charge, headed a group of military policemen who conducted the apprehensions. After they arrived at the military police

due. Moreover, CID had used this informant on a previous occasion, and his information had led to the seizure of heroin.

station,[2] the three suspects were interviewed separately: Perdue by Shanley; Muldoon by Daniels; and Fletcher by a Special Agent Davis. These interviews commenced around 5:00 p. m.

After telling appellant of the information they had received, Special Agent Daniels informed him of his rights. In this connection he employed DA Form 3881, entitled "Rights Warning Procedure/Waiver Certificate." When Muldoon checked a block in the "Non-Waiver" section of this document to indicate "I want a lawyer," Daniels did not question him further about the housebreaking. At about 5:15 p. m., he placed appellant in a "very bare" detention cell located in the same building. Daniels did not contact a lawyer "because I had no intention when I placed him in the detention cell to reinterview him that evening."

No admissions were forthcoming from Perdue during his interviews, but the interrogation of Fletcher proved productive. During a two-hour period after the questioning began at 5:00 p. m., Special Agent Davis obtained from Fletcher a detailed sworn statement, admitting his own complicity in the break-in at the NCO Club and also implicating the appellant and others.

Upon obtaining this statement from Fletcher, Davis, accompanied by Coates, informed appellant and Perdue that their confederate had confessed. At 7:00 p. m., when they talked to appellant, Coates knew that he had been interviewed earlier by Daniels and had made no statement. They did not readvise appellant of his rights; nor did they ask any questions of him. However, Coates did not dispute that he and Davis had been "using interrogation techniques." In his words,

it is a technique—part of a technique to use in any interview in telling them of the uselessness of their situation. In other words, that they had been caught.

\* \* \* \* \* \*

We just confronted them with that we know what we know [and showed them]

[t]hat we have power, position and knowledge.

\* \* \* \* \* \*

We tried to let them know that they had been caught, and if they wanted to do anything it is up to them. I wasn't going to pressure them, I just told them that we knew and let them make their own decision.

According to Special Agent Davis, "The purpose was to see if he wanted to talk to us about it." He agreed that "[t]his was designed to see if he would talk."

After they had read to appellant those portions of Fletcher's statement which implicated him, Muldoon asked to see the signature. Then, having satisfied himself that Fletcher had signed the statement, appellant "decided that he wanted to talk about it." Thereupon Coates advised other CID agents that Muldoon wanted to make a statement; and Special Agent Shanley took him from the detention cell to a vacant office. As Shanley explained, "I was standing there when the military police desk sergeant came back and told me that Muldoon who was in the D cell down the hall wanted to talk to an agent, and since the others were tied up I said 'Well, I'll go and talk to him then.'" Just before entering the office, appellant saw Fletcher, "asked [him] if he had made a statement," and received an affirmative answer.

Special Agent Shanley prefaced the interview by advising appellant of his rights. "He stated at this time, that he had time to think and he wanted to make a statement." Appellant was asked if he wanted a lawyer. Shanley "also advised him that he had already asked for one previously, and that he did not have to make any statements whatsoever." Nonetheless, Muldoon proceeded to execute a written waiver of his rights. The ensuing interview lasted from about 7:00 p. m. until 11:30 p. m., Shanley explaining that he was "not a very fast typist." At some point between 7:30 and 7:45, food was brought in for appellant.

---

**2.** The military police station and the CID office were in the same building and were connected by a corridor.

Over strenuous defense objection, the military judge received appellant's detailed written statement in evidence. The correctness of that ruling is now the issue before us.

## II

 In arguing at trial for the exclusion of Muldoon's confession, defense counsel relied heavily on *United States v. Hill*, 5 M.J. 114 (C.M.A.1978). This reliance was well-placed, since *Hill* is almost on all fours with the present case. There the appellant, after being apprehended and advised by a CID special agent of his Article 31[3] and *Miranda*[4] rights, said that he wanted counsel and did not wish to make a statement. Thereupon the interview terminated. Hill was placed in a detention cell with three other individuals who allegedly had been involved in the same incident. The agent left without making any effort to obtain counsel for appellant. Some nine hours later he returned, and he then related to the four suspects that he had received information about their commission of a robbery. When Hill was interviewed on an individual basis by the agent and readvised of his right to remain silent and have counsel, he acknowledged "that he understood those rights and no longer desired counsel." *Id.* at 115. During the ensuing interview, he admitted his presence at the site of the robbery.

In holding that the statement had been erroneously admitted in evidence, this Court assumed that appellant had not been represented by counsel at the time, so *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976), and *United States v. McOmber*, 1 M.J. 380 (C.M. A.1976), were not controlling. Moreover, we conceded that "a request for counsel does *not forever bar* a subsequent interview." However, we then observed:

[T]he fact that the request has been made makes it more difficult for the Government to satisfy its burden of establishing that an accused has voluntarily waived the right to counsel and the right to have

counsel present at an interview. *United States v. Heslet*, 23 U.S.C.M.A. 88, 48 C.M.R. 596 (1974); *accord, United States v. Solomon*, 17 U.S.C.M.A. 262, 38 C.M.R. 60 (1967). As noted by the United States Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), regarding the right to remain silent:

[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

Thus, the Court held in *Mosley* that a pretrial statement was properly admitted into evidence although the accused had previously asserted his right to remain silent. The Court also implied in *Mosley, supra*, 423 U.S. at 104 n. 10, 96 S.Ct. at 326, that an assertion of the right to counsel may dictate a contrary result as *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.' 384 U.S. at 474, 86 S.Ct. 1602." However, a *per se* exclusionary rule appears to have been rejected in *Brewer v. Williams*, 430 U.S. 387, 405–06, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977), when the Court held:

The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could* not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not. [Footnote omitted.] See *United States v. Rodriquez-Gastelum*, 569 F.2d 482 (9th Cir., 1978).

5 M.J. at 115.

In *Hill*, a majority of this Court concluded that, instead of demonstrating appel-

---

3. Uniform Code of Military Justice, 10 U.S.C. § 831.

4. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lant's voluntary relinquishment of his rights, the record "reflects an erosion of such rights by the government official involved." *Id.* at 116. In the case at bar, no basis exists for reaching a different conclusion.

In both instances the investigators used the same time-honored technique to elicit a statement—namely, informing the suspect that he has been implicated by someone else. Here, the agents candidly admitted that telling Muldoon of Fletcher's confession was one of their "interrogation techniques." We have held that, "When conversation is designed to elicit a response from a suspect, it is interrogation, regardless of the subtlety of the approach." *United States v. Borodzik*, 21 U.S.C.M.A. 95, 97, 44 C.M.R. 149, 151 (1971). To use the phrase employed by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), Coates and Davis were engaged in the "functional equivalent" of interrogation. *Cf. United States v. Dowell*, 10 M.J. 36 (C.M.A.1980).

In *Hill*, nine hours elapsed between the initial interview with the suspect and the subsequent interview when the agent told him of having received incriminating information about his complicity in the crime. In the case at bar, the interval was only about two hours. Thus, here the danger is even more evident that "the continuation of custodial interrogation after a momentary cessation" would allow "repeated rounds of questioning to undermine the will of the person being questioned." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975). Furthermore, unlike the situation in *Mosley*—where the Supreme Court upheld the waiver of the defendant's right to remain silent—the renewed "interrogation" here concerned the same suspected crime which had been the subject of the initial interview.

Special Agent Daniels, who had originally interviewed Muldoon, was not involved directly in the subsequent "interrogation."[5]

Although a change of interrogators was a factor in the Supreme Court's conclusion in *Mosley* that the defendant had waived his right to remain silent, it clearly was not decisive. *Cf. Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Since the four CID agents in the case at hand were functioning as a team in the same investigation, the circumstance that Muldoon was interviewed at different times by different members of that team has minimal significance—especially since here, unlike *Mosley*, the suspect specifically requested at the outset that he be provided with counsel and the investigators failed to comply with this request.

Our holding that Muldoon's statement should have been excluded is supported by other judicial interpretations of *Michigan v. Mosley, supra*. For example, the Nebraska Supreme Court held inadmissible the statement of a juvenile, who, after being advised of his rights, had declined to make a statement but had then been shown police reports which were "likely to elicit an incriminating response" from him. In distinguishing *Mosley*, the Nebraska court relied on the Supreme Court's observation in *Mosley*, that after the defendant asserted his right to remain silent, the police had

> "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation."

*In Interest of Durand*, 293 N.W.2d 383, 387 (1980).

In *People v. Grant*, 45 N.Y.2d 366, 408 N.Y.S.2d 429, 380 N.E.2d 257 (1978), the defendant had been arrested for a homicide and advised of his rights. The defendant said that he was willing to talk to the District Attorney. In turn, he was brought before an Assistant District Attorney, who advised him of his rights. When Grant requested the assistance of counsel, the questioning was terminated, and he was

---

5. However, since Daniels was the Agent-in-Charge of the CID Resident Agency at Heil-bronn, Special Agents Davis and Coates were his subordinates.

taken from the room. No effort was made to assist him in obtaining counsel. Instead, the detective who had arrested the defendant "explained to him that we had several witnesses against him, one being his girl friend." At this point, Grant said that he wanted to see the prosecutor and so—for the second time within less than a quarter of an hour—he was brought before the Assistant District Attorney, who readvised him of his rights. Also, the prosecutor specifically asked Grant why he was now willing to talk without having a lawyer present. After receiving a satisfactory answer to this inquiry, the prosecutor proceeded to take a confession to the killing.

In holding that this pretrial statement should have been suppressed, the New York Court of Appeals declined to decide whether *Miranda* imposes a *per se* rule prohibiting the police from resuming questioning until an attorney is present.[6] Instead, it stressed that:

> Here the arresting officer's conduct was completely inconsistent with the defendant's request because he took no steps to afford the defendant an opportunity to obtain an attorney's assistance, and, in fact, immediately made comments which undermined the defendant's decision to consult an attorney. In addition, unlike the circumstances in *Mosley,* here there was no significant break in the interrogation, and no change of parties, place or subject matter of the interrogation (see

*Michigan v. Mosley, supra,* 423 U.S. p. 104, 96 S.Ct. p. 321). In short on this record it cannot be said that the authorities "scrupulously honored" the defendant's request for counsel before resuming the interrogation and the confession should have been suppressed.

*Id.,* 408 N.Y.S.2d at 435, 380 N.E. at 263.

## II

■ Like many other courts,[7] we have not yet been willing to adopt a *per se* rule precluding any further interview of a suspect who has requested counsel unless he has been furnished such counsel or has himself initiated the interview. Exclusion of Muldoon's statement does not require that we go so far. Instead, we need only rest our holding on the principle stated earlier in *United States v. Hill, supra*—namely, that an accused's invocation of his right to remain silent or of his right to counsel must be "scrupulously honored" by investigators. In the case at hand, the evidence does not establish adherence to this principle. Accordingly, the decision of the United States Army Court of Military Review is reversed. The findings of guilty as to both offenses and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge COOK concurs.

---

**6.** The Court of Appeals acknowledged "cases from other jurisdictions—apparently representing the weight of authority, at least in the Federal courts—which have rejected this view on the theory that the *Mosley* holding evidences a dissatisfaction with per se rules and signifies a departure from the literal wording of the *Miranda* decision." The court then added:

> Semantics aside there would appear to be cogent reasons for distinguishing a request for counsel from a mere refusal to answer questions. As Justice White suggests in his concurring opinion in *Mosley*: "the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with re-

spect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism (*Michigan v. Mosley, supra,* p. 110, n. 2, 96 S.Ct. p. 329; *see, also Brewer v. Williams,* 430 U.S. 387, 405, n. 10, 97 S.Ct. 1232, 51 L.Ed.2d 423).

408 N.Y.S.2d at 434, 380 N.E.2d at 262. This same issue has recently been argued before the United States Supreme Court. *Edwards v. Arizona,* 49 U.S. Law Week 3399 (Dec. 2, '80).

**7.** *See* n. 6, *supra.*

FLETCHER, Judge (dissenting):

I dissent. I adhere to the thinking I expressed in my dissent in *United States v. Hill*, 5 M.J. 114, 116 (C.M.A.1978).

I have no question with the majority opinion's conclusion that the actions of Agents Coates, Davis and Shanley, taken in concert, rise to interrogation as defined in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). I disagree as to the question of whether the appellant waived his right to counsel. I find in the present case there was an effective waiver, in that Agent Shanley did the following:

1. Readvised appellant of his right to silence and counsel.

2. He specifically advised the appellant that since he had previously requested an attorney, he need not "make any statement whatsoever."

3. Secured from appellant an oral statement that having "had time to think," he now "wanted to make a statement."

4. Had appellant sign a waiver statement that now he wanted to talk without a lawyer.

5. Had appellant put in his statement why he decided to talk without a lawyer.

I would affirm the United States Army Court of Military Review.