# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, D.C.

## UNITED STATES

### v.

## Brian E. BONILLA
## Seaman (E-3), U.S. Coast Guard

## CGCMG 0213

## Docket No. 1259

## 6 June 2008

General Court-Martial convened by Commander, First Coast Guard District. Tried at New York, New York, on 17-19 August 2005.

| | |
|---|---|
| Military Judge: | CAPT Brian M. Judge, USCG |
| Trial Counsel: | LCDR Luke M. Reid, USCG |
| Assistant Trial Counsel: | LT Michael A. Fazio, USCG |
| Defense Counsel: | LT James M. Toohey, JAGC, USNR |
| Appellate Defense Counsel: | LCDR Nancy J. Truax, USCG[1] |
| | LCDR Necia L. Chambliss, USCGR[2] |
| Assistant Appellate Defense Counsel: | LT Robert M. Pirone, USCG[3] |
| Appellate Government Counsel: | LT Donna D. Leoce, USCG |

## ON RECONSIDERATION EN BANC[4]

KANTOR, Judge:

Appellant was tried by general court-martial, military judge alone. Pursuant to his pleas of guilty, entered in accordance with a pretrial agreement, Appellant was convicted of one specification of absenting himself and remaining absent from his place of duty, in violation of Article 86, Uniform Code of Military Justice (UCMJ); one specification each of wrongfully using and distributing marijuana, in violation of Article 112a, UCMJ; and one specification of willfully damaging, without proper authority, military property of the United States, in violation

---

[1] LCDR Truax filed the briefs and remained as lead appellate defense counsel until 13 August 2007, at which point she became assistant appellate defense counsel and remained as such until she departed on terminal leave.

[2] LCDR Chambliss was designated as lead appellate defense counsel on 13 August 2007.

[3] LT Pirone was designated as assistant appellate defense counsel on 13 August 2007.

[4] Judges Kenney and Tousley did not participate in this decision.

of Article 108, UCMJ. Contrary to his pleas, Appellant was also convicted of one specification of wrongfully communicating a threat to kill or seriously physically injure another, in violation of Article 134, UCMJ. The military judge sentenced Appellant to a bad-conduct discharge, forfeiture of all pay and allowances, reduction to E-1, and confinement for 300 days. The Convening Authority approved the sentence as adjudged.[5]

Before this Court, Appellant has assigned the following three errors:

I.   Appellant's plea to willful damage to military property is improvident because the military judge only elicited that Appellant intentionally committed an act that resulted in damage and failed to elicit sufficient facts to show that Appellant intentionally caused the damage.

II.  Appellant's plea to unauthorized absence is improvident because the military judge failed to adequately advise Appellant of the effect of detention by civilian authorities on unauthorized absence, failed to elicit facts to show that Appellant actually committed the offense for which he had been detained by civilian authorities, and failed to explain the defense of inability.

III. The military judge abused his discretion in denying a defense motion to suppress Appellant's statements that were made after Appellant invoked his right to counsel, the Government failed to provide Appellant a reasonable opportunity to consult with counsel, and the interrogators acted in a manner likely to evoke an incriminating response.

The third assignment was orally argued to the Court on 19 July 2007.

This Court affirmed the findings and sentence, with one judge dissenting, on 7 February 2008. Appellant moved for reconsideration en banc, and we granted the motion on 24 March 2008. Upon such reconsideration, we affirm our previous decision, albeit by an evenly divided court. *See United States v. Ohrt*, 28 M.J. 301, 303 (C.M.A. 1989). The opinions of 7 February 2008 are withdrawn and replaced with the present opinions.

---

[5] The military judge credited Appellant with 133 days of pretrial confinement. However, the Convening Authority's action only gave him 124 days of credit. This is undoubtedly because of a discrepancy in the date of trial. Paragraph 1.e of the Staff Judge Advocate's Recommendation (SJAR) advised the Convening Authority, "SN Bonilla was held in pretrial confinement from 08 April 2005 until the date of trial, 10 August 2005. He is entitled to 124 days credit for this pretrial confinement." Actually, the trial was held 17-19 August 2005, according to the blue cover of the record, the transcript's statements as to recesses taken on the first day of trial, and the transcript's statement as to adjournment at the end of trial. The nine-day difference in the credit corresponds to the nine-day discrepancy in the trial ending date. The SJAR's and action's error made no difference to Appellant's release date.

We summarily dismiss Appellant's Assignments of Error I and II. With regard to Assignment I, the providence inquiry clearly shows that Appellant picked up a chair in his assigned room in the Unaccompanied Personnel Housing (UPH) building at Coast Guard Sector New York and intentionally threw the chair at a window. (R. at 326, 329.) This act resulted in structural damage to the UPH in the amount of approximately $200.00. Appellant now claims that his plea to willfully damaging military property was improvident because the military judge only elicited information to show intent to do the act that resulted in the damage (throwing the chair) and not the intent to actually cause the damage. We find this argument unconvincing. Breaking the window was the natural and probable consequence of his deliberately throwing the chair at the window. Thus, we find Appellant's plea to this charge provident.

In Assignment of Error II, Appellant claims his plea to unauthorized absence was improvident because the military judge failed to adequately advise him of the effect of detention by civilian authorities, particularly claiming that there is nothing to show he committed the offense for which he was detained. Manual for Courts-Martial (MCM), Part IV, ¶ 10.c.(5), United States (2005 ed.), states that a member, detained while on authorized leave, may be found guilty of unauthorized absence only if it is proved that the member actually committed the offense for which detained, implying that a conviction is necessary. However, in *United States v. Myhre*, 9 USCMA 32, 33, 25 C.M.R. 294, 295 (1958), the Court of Military Appeals concluded that the character of the absence should be examined to determine whether the absence was "'through his own fault.'" Furthermore, in *United States v. Sprague*, 25 M.J. 743 (A.C.M.R. 1987), it was held that a guilty plea was provident where the accused admitted his arrest was the result of his own fault, despite the fact that he was released without trial. In this case, Appellant stipulated that he was arrested in the early morning hours for driving while intoxicated. He admitted during the providence inquiry that a Breathalyzer test indicated that he was intoxicated, and that the police had a reason to arrest him. (R. at 317.) These admissions distinguish the case from *United States v. Jones*, 64 M.J. 621 (C.G.Ct.Crim.App. 2007), where there were no such admissions. They are sufficient to satisfy the requirement of MCM ¶ 10.c.(5) that Appellant may be found guilty only if he actually committed the offense for which he was detained, so that the absence was the result of his own misconduct. We, thus, find the plea

provident. We now examine Assignment of Error III, which requires a detailed recitation of the underlying facts.

### Factual Background

Appellant's short Coast Guard career was not without problems. On 25 January 2005, at Coast Guard Sector New York, Appellant was interrogated by two special agents of the Coast Guard Investigative Service (CGIS) who suspected him of using and distributing marijuana. Charges alleging violations of Articles 86 and 112a, UCMJ, were subsequently preferred against him on 9 March 2005. LT James M. Toohey, JAGC, USNR, was detailed to represent SN Bonilla in regard to these charges.

On 8 April 2005, before the above-mentioned charges could be brought to trial, the CGIS Office in New York City received a call informing them that Appellant had made threats to kill a senior chief at Sector New York. This warning had been passed on by a defense counsel representing one SN Zachary Miller, an associate of Appellant. Coast Guard Special Agent Robert Mullinax called the Coast Guard Police Department (CGPD) at Sector New York and requested that CGPD officers detain Appellant pending his arrival. Special Agent Mullinax, along with Agents Head, Ohearn, and Neary then departed their office enroute the CGPD at Sector New York.

Acting at the direction of Special Agent Mullinax, CGPD Officers Conca and Hamel called Appellant's cell phone number at approximately 1652. Learning that he was in his barracks room, they instructed him to remain there until they arrived. When the officers arrived at Appellant's room, they entered and immediately handcuffed him before taking him to the CGPD office. Following his arrival at the CGPD office, at about 1700, Appellant was unhandcuffed from the rear and rehandcuffed in the front using a restraining belt.

Prior to the arrival of the CGIS agents, Officer Hamel of the CGPD advised Appellant of his rights under Article 31, UCMJ, although it appears that Officer Hamel was unable to inform Appellant of the reasons surrounding his detention. Officer Hamel advised Appellant of his rights because Appellant was making statements, not because he intended to question Appellant.

Appellant acknowledged understanding his rights; stated that he wanted his lawyer, presumably LT Toohey; and that he did not want to speak to Officer Hamel. However, Appellant asked repeatedly, "Why am I here?"-type questions. CGPD officers indicated that they did not know but that CGIS agents were on their way. Around this time, Appellant pulled out his cell phone and attempted to call his attorney. He was informed by a CGPD officer that he was not allowed to make calls. He did not tell this officer that he was attempting to call his attorney.

When the special agents arrived at Sector New York's CGPD at about 1715, they initially spoke with SN Miller and a SN Herrington. The agents spent several hours interviewing these two individuals about what they knew about the alleged threat made by Appellant. There was no interaction between the CGIS agents and Appellant until approximately 2159. During this time, Appellant remained handcuffed and did not receive any food or water from the CGPD officers.

At approximately 2154, Special Agents Mullinax and Head entered the small room where Appellant was being held. They were aware that Appellant had been advised of his Article 31 rights and that he had requested a lawyer. As a result, they did not direct any questions to Appellant, but the two agents engaged in idle conversation about the case. Special Agent Mullinax testified that he hoped this conversation would result in SN Bonilla reinitiating discussions about the case. Within five minutes, Appellant asked one of the agents, "Sir, can I ask what this is about?" The agents replied that they could not speak with Appellant unless they read him his rights and he was willing to waive his rights. Appellant agreed to do so. After speaking with someone in the First District Legal Office, the agents prepared the necessary waiver forms. At approximately 2219, Appellant read and signed a waiver form, indicating that he understood and waived his rights. This form also informed him of the offense he was suspected of committing. Appellant testified that once he signed the waiver, he felt he was obligated to provide a statement. He was questioned until approximately 0200 on 9 April 2005. During this time, he was offered food and drink on several occasions which he declined. He did take advantage of a smoke break or two, at which time he was uncuffed. After the questioning, Appellant wrote a statement admitting that he communicated a threat against Senior Chief Francis Gorman. He completed this statement at approximately 0250 on 9 April 2005. This was followed by a consent search of his barracks room and his personal automobile. He remained in

local Coast Guard custody until he was taken to the Navy brig in Groton, Connecticut, later that day.

## Discussion

In the landmark case of *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court required that prior to any custodial interrogation, the putative defendant must be advised that he has the right to remain silent and also the right to the presence of an attorney. When an accused indicates that he wishes to remain silent, "the interrogation must cease." *Id.* at 474. If he requests counsel, "the interrogation must cease until an attorney is present." *Id.* at 474.

Subsequently, in *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court established a bright-line rule concerning statements made in custodial interrogation after the suspect has invoked his right to speak to an attorney. It said: "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85; *see also* Military Rules of Evidence (M.R.E.) 305(f)(2) and 305(g)(2)(B). Furthermore, *Edwards* reiterated an earlier requirement that should a suspect initiate further communication, any subsequent waiver of the right to counsel must be shown to be not only voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege. 451 U.S. at 482. Thus, we must first determine whether Appellant initiated further communication or the actions of the special agents amounted to an unlawful interrogation, or the functional equivalent thereof, prior to Appellant asking his question about why he was being detained.

We find that Appellant initiated communication with the special agents. The statement made by Appellant in this case ("Can you tell me what this is about?") is remarkably similar to the statement made by the defendant in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983). In that case, Bradshaw, after being taken into custody and indicating his desire to be represented by an attorney, inquired of a police officer, "Well, what is going to happen to me now?" *Id.* at 1042. Much like what happened in this case, the police officer exercised caution and reminded

Bradshaw that he was not obligated to discuss the case. Referring to its decision in *Edwards*, the Court reiterated that before a suspect who is in custody can be subjected to further interrogation after requesting the presence of an attorney, there must be a showing that the suspect not only initiated a dialogue with the authorities but that he voluntarily, knowingly, and intelligently waived his right to counsel. *Id.* at 1044-45. Recognizing that each suspect's question to law enforcement officials must be evaluated under the particular circumstances of each case, we find compelling similarities between Bradshaw's self-initiated request to speak with police officers and the instant case. *See id.* at 1045. If Bradshaw's question can be construed as a desire for a generalized discussion about the investigation, we see no reason why Appellant's question in this case should not be seen as an initiation of conversation about the case as envisioned in *Edwards*.

Appellant questions the tactics used by the special agents that preceded his inquiry, claiming that they initiated an unlawful interrogation or its functional equivalent. Appellant particularly notes that he was handcuffed and left in a small room for over five hours. When he attempted to contact his lawyer, he was told he was not allowed to use his telephone. After the special agents had completed interviewing the two witnesses, they entered the small interrogation room and briefly discussed the case in the presence of Appellant, admittedly to see if he would initiate communication. While the conduct of the special agents is borderline, we find the facts insufficient to establish an unlawful interrogation. In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court examined the issue of what constitutes an "interrogation." First, interrogation must "reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. Interrogation and the functional equivalent thereof consist only of express questioning or actions that are reasonably likely to elicit an incriminating response. *Id.* at 301. These may include not only direct statements requesting incriminating information but also more subtle tactics, including "psychological ploys, such as to posit the guilt of the subject, to minimize the moral seriousness of the offense, and to cast blame on the victim or on society." *Id.* at 299 (internal quotation marks omitted). Determining whether words or actions are reasonably likely to elicit an incriminating response turns on "the perceptions of the suspect, rather than the intent of the police." *Id.* at 301.

Applying these principles to this case, we do not find that the special agents were conducting the equivalent of an interrogation prior to Appellant's inquiry. No threats were made, there was no compelling pressure being placed upon Appellant beyond his custody, and there were no pleas to his conscience or other ploys the agents knew were reasonably likely to elicit an incriminating response. In fact, no words were spoken to Appellant until he self-initiated the discussion with the special agents. Until such time, the agents honored his right to remain silent and his invocation of the right to counsel by not interrogating him after he invoked his rights. Once Appellant asked the agents why he was being held at the station, Special Agent Mullinax responded with a simple and correct statement of investigative procedures – that they could not speak with Appellant unless they read him his rights and he agreed to waive his rights. *Miranda* prohibits the use of psychological ploys to elicit a confession following an invocation of rights; it does not, however, prohibit truthful statements by the police that furnish information concerning procedural requirements or the status of their investigation, so long as they are not objectively likely to result in an incriminating response. *See United States v. Allen*, 247 F.3d 741, 765-66 (8th Cir. 2001).

Finally, we believe Appellant voluntarily, knowingly, and intelligently waived his rights prior to giving his written statement. The agents prepared a rights advisement form which included the crimes he was suspected of committing as well as the standard *Miranda* rights. He freely signed the waiver form and indicated that he understood his rights. Appellant was twenty years old and had a GED at the time. He also had familiarity with the criminal investigative process based upon his earlier troubles involving allegations of illegal drug use and distribution. Further demonstrating his understanding of the situation, Appellant also signed a consent form allowing the agents to search his automobile and his barracks room during the early morning hours of 9 April 2005.

## Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings and sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence as approved below are affirmed.

Judges TUCHER and LODGE concur.

Chief Judge MCCLELLAND (concurring in part and dissenting in part):

I concur on Assignments I and II. I dissent from the decision on Assignment III.

The majority rightly cites *Edwards v. Arizona*, 451 U.S. 477 (1981), for the rule that when an accused has invoked his counsel right, he may not be interrogated without counsel unless he initiates further communication, exchanges, or conversations with the police. In the military, the rule is captured in Military Rule of Evidence (M.R.E.) 305(g)(2)(B)(i).[1] Failure on the part of government agents to follow these rules will lead to a presumption that the statement was involuntary and any subsequent waiver of the right to counsel obtained during the custodial interrogation concerning the same or different offenses is invalid. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the Supreme Court further developed the question of what constitutes initiation by the accused of further communication, exchanges, or conversations. In that case, the accused had been arrested and had invoked his right to counsel, whereupon the conversation had been terminated. Later, the accused "inquired of a police officer, 'Well, what is going to happen to me now?' The officer answered by saying 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say-because-since you have requested an attorney, you know, it has to be at your own free will.' Respondent said he understood." *Id.* at 1042 (citations omitted). Further conversation ensued, and the accused later, after again being advised of his rights and waiving them, confessed. The Supreme Court held the confession admissible. In effect, initiation of conversation about the offense by the accused rendered nugatory his previous invocation of his right to counsel, although it did not itself constitute a waiver of the right.

The Supreme Court also said, "There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to

---

[1] The rule is modified where the accused has not been in continuous custody. M.R.E. 305(g)(2)(B)(ii). The present case involves continuous custody.

represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Id.* at 1045.

The question in this case is whether Appellant initiated further communication. If he did, the special agents were entitled to again advise him of his rights and ask him whether he wished to waive them, and his resulting statements were admissible. If he did not, or if the special agents initiated interrogation before he did so, Appellant's statement must be suppressed.

The majority finds that the agents did not initiate interrogation or its functional equivalent. Their actions in entering the room where Appellant was being held were designed to see if Appellant would "reinitiate" communication – and were reasonably likely to have that effect, given that Appellant had been asking why he was there and had never been answered. In *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Supreme Court condemned police tactics that they should know are reasonably likely to elicit an incriminating response. This is a stage beyond reinitiation of communication. I agree that the special agents' actions cannot be said to be likely to elicit an incriminating response, even if that was their ultimate intended (hoped-for) purpose.

In the totality of the circumstances of this case, I would find that Appellant did not initiate further conversation within the meaning of *Edwards*. When Appellant was advised of his Article 31 rights by Officer Hamel on 8 April 2005, he was not told what he was accused of. The military judge specifically found that both before and after his invocation of counsel rights, Appellant repeatedly asked the officers why he was being detained. Article 31, UCMJ, includes the requirement to inform a suspect of the nature of the accusation, yet when Appellant was given his Article 31 rights, he was not told the nature of the accusation. When Appellant asked Special Agent Mullinax, "Sir, can I ask what this is about?" he was merely re-raising his earlier question to an official who was in a position to know the answer. It was disingenuous for the agents to simply respond that they could not speak with him unless they read him his rights and he was willing to waive his rights. They could have and should have completed the rights advice

10

left incomplete earlier. Given the gap in the rights advice that had been given to him, in my view, Appellant's question related "to routine incidents of the custodial relationship," and did not "'initiate' a conversation," in the words of the Supreme Court in *Bradshaw*, 462 U.S. at 1045.

Further, Appellant was apprehended and taken to the CGPD office at about 1700 on 8 April 2005. His status surely changed to either arrest, Rule for Courts-Martial (R.C.M.) 304(a)(3), Manual for Courts-Martial, United States (2005 ed.), or pretrial confinement, R.C.M. 304(a)(4), shortly thereafter.[2] Article 10, UCMJ, requires that upon arrest or confinement, "immediate steps shall be taken to inform [the person arrested or confined] of the specific wrong of which he is accused." Implementing this requirement, R.C.M. 304(e) requires that when placed under restraint (including arrest or confinement), a person "shall be informed of the nature of the offense which is the basis for such restraint." Thus, there was a specific requirement, apart from the incomplete Article 31 rights, that Appellant be informed of the answer to his question as a routine incident of the custodial relationship. That he was not transported to a brig until many hours later did not relieve the Government of this obligation or make his asking for such information something other than a routine incident of the custodial relationship.[3]

I would therefore hold that Appellant did not initiate a conversation, vitiating his earlier invocation of the right to counsel, and therefore, as in *Edwards*, his subsequent waiver of rights was invalid and his statements were inadmissible. As those statements were admitted at trial on the merits, in the form of testimony by Special Agent Mullinax, the conviction should be reversed unless the erroneous admission is found harmless beyond a reasonable doubt. I would not so find in this case. Although Appellant's own testimony confirms his commission of the offense (while contending that it was a joke), we cannot assume that he would have testified in the absence of Special Agent Mullinax's testimony about his statement. The essentiality of Appellant's testimony is clear, since the military judge, in finding him guilty, amended the

---

[2] The military judge concluded that pretrial confinement commenced on 8 April 2005. (R. at 840.) I agree with this determination.

[3] I have found no cases applying R.C.M. 304(e). Predating the rule, there are some old cases acknowledging the Article 10 requirement without definitively interpreting it, *e.g.*, *United States. v. Snook*, 12 USCMA 613, 31 C.M.R. 199 (1962); *United States v. Sloan*, 47 C.M.R. 436 (A.C.M.R. 1973); *United States v. Finegan*, 47 C.M.R. 805

specification by exceptions and substitutions to conform to Appellant's version of what he had said.

It might be said that my analysis is not within the obvious mandate of *Bradshaw*. However, the superficial similarity of the accuseds' questions in *Bradshaw* and in this case masks the entirely different factual contexts of the two cases. Moreover, *Bradshaw*'s legal context does not include the UCMJ provisions that apply here.

The *Bradshaw* decision gives examples of inquiries that cannot be said to "initiate" a conversation, allowing a new rights advisement with the possibility of a reversal of the previous invocation of rights. The examples are "a request for a drink of water or a request to use a telephone." 462 U.S. at 1045. Undeniably, Appellant's question had an association with the offense under investigation not found in the neutral subjects of refreshments and telephone calls. Yet the requirement in R.C.M. 304(e) to inform him of the wrong of which he was accused is a generic one that applies to every instance of arrest or confinement that comes within the ambit of the UCMJ[4]. I therefore think it readily falls within *Bradshaw*'s "routine incidents of the custodial relationship." *Id.* at 1045. I further think this analysis is entirely consonant with the principles of *Bradshaw* and *Edwards*.

The Government has argued that this viewpoint would result in the reversal of numerous cases. If true, the Government would have needlessly brought such a result upon itself. When an accused has invoked the right to counsel, the Government can only expect that no statement will likely be obtained from that accused. If it later turns out that the accused initiates a conversation and a statement is obtained, it is a windfall to the Government. I see no reason to confer this Court's blessing on the Government's "pushing the envelope" as was surely done in this case when the special agents entered the room and sat down with no discernible purpose other than to give Appellant the opportunity to initiate a conversation.

---

(N.C.M.R. 1973). One need not delimit the time boundaries of the rule. It suffices to say that it clearly requires informing a detained accused of the accusation against him as a routine incident of his detention in custody.

I would set aside the findings of guilty of Additional Charge III and its specification.

FELICETTI, Judge, with whom Judge PEPPER joins (concurring in part and dissenting in part):

We respectfully dissent from the decision on Assignment III, agreeing with Chief Judge McClelland that Appellant did not initiate further conversation within the meaning of *Edwards v. Arizona*, 451 U.S. 477 (1981). However, we would also hold that the agents' actions rose to the level of an interrogation and, therefore, violated Appellant's invocation of his counsel rights.

Appellant was apprehended by uniformed officers who did not know why they had been directed to take him into custody. His Article 31, Uniform Code of Military Justice, warning was, therefore, defective, and Appellant's questions about what this was all about went unanswered. He remained handcuffed with a restraining belt in a small room for several hours after invoking his counsel rights. At 2159, two agents crowded into the small room with Appellant and one to three uniformed officers. The reason for this close contact was the agents' hope that Appellant would reinitiate discussions about the case. They proceeded, therefore, to talk to each other, including some idle conversation about the case, and tried to avoid looking at Appellant despite the awkwardly close quarters. Based on this record, these actions clearly appear to be part of a subtle interrogation plan.

It worked, as might reasonably be expected given Appellant's prior questions about the nature of the accusation against him. After about five minutes, Appellant again asked what this was all about. The agents did not correct the earlier rights advisement by providing Appellant with information to which he was entitled. Instead they responded that they could not speak to Appellant unless he was willing to waive his rights. In other words, he must agree to waive his rights up front in order to learn the nature of the allegation against him. Appellant agreed.[4]

---

[4] Here I part company with the military judge, who called Appellant's question an open-ended one and "more than merely an inquiry necessitated by the fact that he was in custody." R.C.M. 304(e) necessitated an answer to the question, if not the question itself.

It is true that he then received a proper rights advisement that answered his question before he formally waived his rights. However, Appellant's testimony shows that he did not think he could back out from his earlier verbal agreement. (R. at 75, 77.) As such, the presumption of taint remains undisturbed. The waiver and subsequent statement, therefore, flowed directly from a subtle interrogation technique that involved the knowing exploitation of a defective Article 31 rights advisement.[1]

Instead of exploiting the defective Article 31 rights advisement, the agents should have scrupulously honored Appellant's request for counsel. *United States v. Muldoon*, 10 M.J. 254, 258 (C.M.A. 1981). The subtlety of the approach does not matter. *Id.* at 257. "Interrogation techniques" that have several steps before eliciting a response can still amount to an interrogation. *Id.* In the military, moreover, simply forcing a suspect to be in the presence of a superior officer can, under the right circumstances, amount to an interrogation. *United States. v. Brabant*, 29 M.J. 259, 260-261 (C.M.A. 1989). This is true even if the superior officer tells the suspect to say nothing and see a lawyer when he tries to initiate a conversation about the matter. *Id.*

An interrogation, therefore, consists of words or actions, except those normally incident to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); Military Rule of Evidence 305(b)(2). Our higher court applied the *Innis* standard in *United States v. Muldoon* where agents interrogated the suspect by simply talking at him after he invoked his counsel rights. The goal was to soften him up, get him to re-initiate discussions, waive his previously invoked counsel rights, and only then make a statement. *Muldoon*, 10 M.J. at 255. No questions were asked until after the suspect properly waived his rights. Nonetheless, a unanimous court, including the dissent, held that the actions of the agents rose to the level of interrogation. *Id.* at 257, 259.

---

[1] The agents directed uniformed officers to detain Appellant without telling them the nature of the allegation against him. The agents knew that these same uniformed officers advised Appellant of his Article 31 rights after taking him into custody. Thus, the agents knew that Appellant received a defective Article 31 rights advisement that omitted the nature of the accusation against him.

This case presents an even more subtle interrogation plan. Nonetheless, there clearly was a plan to soften up Appellant and induce him to reinitiate discussions. The plan included forcing Appellant to be in the close presence of the agents. This forced close contact, along with the words and actions of the agents, subtly pressured Appellant to reinitiate discussions. Moreover, the agents knowingly exploited a defective Article 31 rights advisement. This alone clearly distinguishes this case from the superficial resemblance to *Oregon v. Bradshaw*, 462 U.S. 1039 (1983).

A custodial interrogation plan involving the knowing exploitation of a defective Article 31 rights advisement should have no place in the military justice system. We would, therefore, set aside the findings of guilty to Additional Charge III and its specification.



For the Court,


Jane R. Lee
Clerk of the Court