UNITED STATES, Appellee,

v.

Johnnie K. GOODSON, Specialist Four,
U.S. Army, Appellant.

No. 44430.
SPCM 16459.

U.S. Court of Military Appeals.

July 23, 1984.

For Appellant: *Captain Kenneth G. Gale* (argued); *Colonel William G. Eckhardt, Colonel R. Rex Brookshire, II, Major Paul J. Luedtke* (on brief); *Lieutenant Colonel William P. Heaston, Captain Thomas R. Peppler.*

For Appellee: *Captain Thomas E. Booth* (argued); *Colonel R. R. Boller, Lieutenant Colonel John T. Edwards, Captain Patrick M. Flachs, Captain Michael E. Pfau* (on brief).

*Opinion*

COOK, Senior Judge:

Tried by special court-martial, military judge alone, the accused was convicted, in accordance with his pleas, of possession and use of marijuana, and, contrary to his pleas, of attempting to possess, transfer, and use amphetamines, in violation of Articles 134 and 80, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 880, respectively. The approved sentence extends to a bad-conduct discharge, confinement at hard labor for 3 months, forfeiture of $334.00 pay per month for 3 months, and reduction to E–1. The findings and sentence were affirmed by the Court of Military Review. 14 M.J. 542 (1982).

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY RULING THAT THE APPELLANT VOLUNTARILY AND VALIDLY WAIVED HIS RIGHT TO COUNSEL DURING INTERROGATION AFTER BEING DETAINED FOR NINE OR TEN HOURS IN THE MILITARY POLICE STATION AWAITING INTERROGATION, AND AFTER CLEARLY ARTICULATING ON THREE SEPA-

RATE OCCASIONS REQUESTS FOR COUNSEL WHICH WERE DENIED.

Finding no error, we affirm.

During the early morning hours of February 28, 1981, the accused and eight others were apprehended at Aberdeen Proving Grounds, Maryland, on suspicion of wrongful possession of a controlled substance. The nine suspects were transported to the military police station where processing and interrogation were conducted by Military Police Investigator (MPI) Dennis Allinder. Sergeant Faron Slye, a military policeman who assisted in the apprehension, testified that shortly after arrival at the station the accused "said that he didn't want to make a statement; that he requested a lawyer." Slye responded, "[F]ine, I will relay this information, this message, to the investigator." Slye "explained to him that all that we were going to be doing was that he was going to be read his rights and a field interview worksheet taken on him." Later on the accused made a second request to Slye to see a lawyer, and Slye said he would relay the request to MPI Allinder. Slye testified that he did in fact inform Allinder of the accused's requests.

MPI Allinder testified that he did not recall anyone informing him that the accused wanted to see an attorney. He was the only investigator on duty at the time, and he interviewed the suspects singularly. He did not get to the accused until approximately nine hours later. When the accused came into his office, Allinder "advised him of his rights on the DA Form 3881, asked him if he understood, which he said he did." The accused initialed several places on the form, including the acknowledgment that he understood his "right to talk to a lawyer before or after questioning or have a lawyer present with me during questioning." The accused signed the form in the section entitled "Waiver"[1] and signified that he was "now willing to discuss the offense(s) under investigation ... and

make a statement without talking to a lawyer first and without having a lawyer with me." Allinder stated that the accused never requested a lawyer, never indicated that he wished to remain silent, and never indicated that he had previously asked to see a lawyer.

The accused offered a different version of the events of the morning. He said that, upon arrival at the station, Sergeant Slye "told me not to sign it [a statement form], just say I didn't want to speak." He related the two times he asked Slye for counsel, but said that Slye said he "couldn't have one." He further testified that he "asked to call and Investigator Allinder, he told me that the acting JAG on duty was just for their use only and I couldn't use him." However, he admitted that when he was "called ... in for questioning," he did not request a lawyer because "[t]hey already knew" and he "didn't think ... [he would] get one." The accused made an incriminating oral statement to Allinder, and it was used to prove the contested allegations.

On the 2nd of March, the accused's company commander, Captain Candace Fox, having been informed of the incident, called the accused into her office. She advised him of his rights as set out on DA Form 3881. She was unaware of the events at the police station. The accused waived his rights again and made a written statement which he later swore to before the battalion adjutant. The accused never asked for counsel from her, and she did not know of his earlier requests. After taking the statement, she called the defense counsel and made arrangements for the accused to see him.

The accused confirmed that he did not "ask for a lawyer" from Captain Fox, since "I thought I was already hung, sir, I just didn't stand a chance because they already knew."

---

1. The waiver section reads: "Understanding my rights as stated above, I am now willing to discuss the offense(s) under investigation *without a lawyer being present*." However, the italicized words were lined out, and these words written in (presumably by MPI Allinder): "and make a statement without talking to a lawyer first and without having a lawyer with me." The accused's initials appeared after the period.

After argument from counsel the military judge denied the motion to suppress the statements to Allinder and Fox, and made these findings:

1. That in the early morning hours of 28 February 1981 the accused was apprehended by military police and transported to building 2004, Aberdeen Proving Ground, Maryland for interrogation, arriving at approximately 0230 hours.

2. That the interrogation of the nine suspects resulting from the apprehension was conducted by one agent, MPI Allinder, and that the accused was not interviewed by Allinder until approximately 1200 hours, some nine to ten hours after the initial apprehension. During this wait the accused was held with the other suspects in a waiting area that was adjacent to the Military Police Investigator's offices. The suspects were not cuffed or placed in cells while awaiting interviews.

3. During the wait to be interviewed and [to have] their rights explained by the MPI Agent the accused requested to see a lawyer and permission to call a lawyer approximately three times in the first two hours. He was told that he could not see a lawyer at that time and that the on-duty JAG officer could not be called by the accused.

4. At one point during the wait the accused was informed that he should not make any statements and sign anything until his rights were read to him by the MPI Agent.

5. At approximately 1200 hours the accused's turn came to be interviewed by MPI Allinder who proceeded to explain fully what the accused was suspected of and what his rights were. After informing the accused of his rights as found on Prosecution Exhibit 1 for Identification and eliciting that the accused understood his rights, Agent Allinder asked the accused if he wanted a lawyer present. The accused stated no, and that he was willing to discuss the offenses.

6. The wait, although long, was not prejudicial to the accused in any way because no attempted interrogation was begun until after he waived his rights. Nothing presented would indicate that the accused's waiver was anything other than intelligently, consciously, and voluntarily given. The government actions in interviewing the accused may have been slow because of the number of suspects, but was not in any way improper or illegal.

7. We find the questioning conducted by Captain Fox on the 2nd of March was done pursuant to rights required by Article 31 and that the interview was conducted by Captain Fox with the knowledge that the accused was arrested on drug charges on the 28th of February. We find the accused consciously, intelligently and voluntarily waived his rights as found in Prosecution Exhibit 2 for Identification and that the statement which is marked Prosecution Exhibit 3 for Identification was properly taken by Captain Fox as a result of this interview.

We further find that in relation to the 28th of February, that the accused's initial request for a lawyer made soon after he was brought to the station to talk to a lawyer was not made at a time when he had full knowledge of his rights and was not due to any interrogation whatsoever. It is not uncommon for one arrested to want to see a lawyer, but the state of the law does allow the government to inform the accused of his rights and then ask if he understands them. Once ascertaining the suspect understands his rights, the next question is to whether he wants a lawyer present. The accused had his opportunity at that point when questioned by Agent Allinder to state that he did want an attorney and that would require the government to suspend any further questioning. In this case the accused, after being informed of his rights completely and for the first time by MPI Agent Allinder at approximately 1200 hours, he consciously elected not to demand a lawyer and waived his rights. Therefore the statement taken by MPI Agent Allinder was voluntarily and intelligently given by the accused with full knowledge of his rights.

Both at trial and on appeal the accused argued that the then recently-decided case [2] of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), bars his interrogation by the military police after he made a request for counsel. We do not believe that *Edwards* is determinative in the instant factual context.[3]

Edwards was arrested pursuant to a complaint charging him with robbery, burglary, and murder, and taken to the police station. There he was advised of his rights under the fifth amendment as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Edwards stated that he was willing to submit to questioning and gave a statement denying involvement and presenting an alibi defense. However, after being told that another suspect had implicated him, Edwards "sought to 'make a deal.'" After attempting to call the county attorney, Edwards hung up and said: "I want an attorney before making a deal." 451 U.S. at 479, 101 S.Ct. at 1882. Questioning stopped and Edwards was taken to the county jail. The next morning two detectives came to the jail and asked to see Edwards. Edwards said he did not want to talk to anyone, but a detention officer "told him that 'he had' to talk and then took him to meet with the detectives." *Id.* at 479, 101 S.Ct. at 1882. After being readvised of his *Miranda* rights, Edwards eventually implicated himself in the crimes. Over his objection, his statement was admitted against him at trial. On appeal the Arizona Supreme Court held that Edwards had invoked both his right to remain silent and to counsel during the interrogation, but that he had voluntarily waived both rights at the second interview. The Supreme Court, however, held that the use of his confession at trial violated his fifth- and fourteenth-amendment rights and reversed the conviction.

*Edwards v. Arizona, supra,* is concerned with the voluntariness of a waiver of *Miranda* rights after advisement and after assertion of those rights:

> It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

*Id.* at 482, 101 S.Ct. at 1884, quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The Court further held

> that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. at 1884–1885. Thus, *Edwards* is merely an extention and interpretation of the *Miranda* decision. The Supreme Court "emphasize[d] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel," *id.* at 485, 101 S.Ct. at 1885, unless the two-part test has been met to establish a "knowing and intelligent" waiver of that right.[4]

---

**2.** *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, was decided on May 18, 1981. The accused was tried on May 21, 1981. His interrogation occurred as noted on February 28, 1981. In *Solem v. Stumes,* ___ U.S. ___, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), the Supreme Court held that since "*Edwards* established a bright-line rule to safeguard preexisting rights," it would not be applied retroactively at least "in collateral review of final convictions." 104 S.Ct. at 1343, 1345. Whether it would be applied and at what stage of the proceedings, in direct-review cases, was not then decided.

**3.** The military judge was provided with a copy of the slip opinion in *Edwards,* and his findings indicate that he did not believe it applied.

**4.** There seems to be some doubt as to whether the "two-part" test is now only one part. The majority in *Solem v. Stumes, supra,* defined *Edwards* in this fashion: "*Edwards* established a new test for when that waiver would be ac-

The factual situation before us here is quite different. Goodson made all of his requests for counsel *before* he was advised of his rights and while the case against him was still in the investigatory stage. He had previously been advised not to make a statement and to say that he did not want to speak when he was brought to the military police office where he "was going to be read his rights and a field interview worksheet taken on him." Although a period of some 9 hours [5] lapsed before his rights were read to him, no attempt was made to interrogate him before he was formally advised of his rights by the military police investigator who was conducting the investigation.

The question is: Does an accused have a right to have an attorney appointed at that time? *Miranda v. Arizona, supra,* applies only to "custodial interrogation," which was there defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted). A person in such custody must be advised of his "right to remain silent, that any statement he does make may be used ... against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* However:

This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does

mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

*Id.* at 474, 86 S.Ct. at 1628. Furthermore:

When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.

*Id.* at 477–78, 86 S.Ct. at 1629–30.

Our consideration of *Miranda* leads to the conclusion that the right to appointed counsel does not arise until in-custody interrogation has begun. The corollary is that a waiver of the *Miranda* rights cannot occur unless there has been a full advisement of rights. The cases following *Miranda,* including *Edwards; Oregon v.*

---

ceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication." 104 S.Ct. at 1343. Justice Powell, concurring in the judgment, believed that the majority had "established a new *per se* rule and to that extent overruled *Johnson v. Zerbst,*" 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *Id.* at 1346. Earlier in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), Justice Powell, concurring separately, stated:

But the question of whether a suspect has waived this important right to counsel is uniquely one of fact, and usually must and should be left to the judgment of the trial court that has had the benefit of hearing the evidence and assessing the weight and credibility of testimony.

*Id.* at 2838.

**5.** The evidence here does not reveal the sort of police conduct condemned by *United States v. Hill,* 5 M.J. 114 (C.M.A. 1978) (after advisement of rights and a request for counsel, accused was placed in a detention cell for 9 hours and then confronted with an assertion that he had been implicated by one of the participants in the robbery—no effort was made to provide him with counsel); or *United States v. Muldoon,* 10 M.J. 254 (C.M.A. 1981) (after being advised of his rights and requesting counsel, accused was "placed ... in a 'very bare' detention cell" for 2 hours, *id.* at 255, and then confronted with an implicating statement from a confederate—no attempt was made to provide him with counsel).

*Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); and *Solem v. Stumes,* ___ U.S. ___, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), have examined alleged waivers made after advisements of rights had been given and requests for attorney assistance had been made. Hence, they are not helpful in resolving the specific question now before us.

Our own cases of *United States v. Hill,* 5 M.J. 114 (C.M.A. 1978), and *United States v. Muldoon,* 10 M.J. 254 (C.M.A. 1981), are likewise concerned with interrogation of an accused after advisement and assertion of rights guaranteed by *Miranda* and *United States v. Tempia,* 16 U.S.C. M.A. 629, 37 C.M.R. 249 (1967).[6] They also do not address the question we are considering here.

While we recognize a significant difference between deprivation of counsel in violation of the sixth amendment and violation of the right against self-incrimination prohibited by the fifth amendment, we have examined sixth-amendment cases to see if they recognize a right to counsel prior to the in-custody interrogation phase of a prosecution. Although we note that *Edwards* specifically declined to decide whether there was a sixth-amendment deprivation of counsel in that situation, in view of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), 451 U.S. at 480–02 n. 7, 101 S.Ct. at 1882–84 n. 7, our examination of sixth-amendment cases fails to reveal any case creating the right to counsel earlier than the initiation of in-custody interrogation.

In *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), the petitioners claimed that they had been subjected to a station-house line-up under circumstances so unduly prejudicial as to taint a later in-court identification and to deprive them of a fair trial; that a preliminary

hearing in Alabama had been a "critical stage" of the prosecution and failure there to provide them with counsel was a violation of their sixth and fourteenth amendment rights. Following the dictates of *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932), *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 926, 1932, 18 L.Ed.2d 1149 (1967) (footnotes omitted), held "that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." Therefore, the *Coleman* Court concluded that "critical stages" included pretrial arraignment, pretrial line-ups, and the preliminary hearing held in that particular case. It added that *Miranda* held "that the privilege against compulsory self-incrimination includes a right to counsel at a pretrial-custodial interrogation." *Id.* at 7, 90 S.Ct. at 2002. Later cases have focused on the right to counsel at pretrial line-ups and out-of-court identifications. *See Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), and cases cited therein.

I conclude that the reference in *Coleman v. Alabama* to *Miranda* as "*Cf.*" would indicate that it represented the farthest point from trial that the right to counsel has been recognized, but then only in the fifth-amendment context.

There is nothing in either the Uniform Code of Military Justice or the Manual for Courts-Martial, United States, 1969 (Revised edition), that would establish a right to appointed counsel prior to a pretrial investigation under Article 32. Our case law and service regulations give greater access

---

**6.** In *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), which brought the doctrine of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), into the field of military justice, the accused had been advised of his right to counsel prior to custodial interrogation and had asked for counsel. Instead, un-

der then current regulations of the Air Force, he was referred to the Staff Judge Advocate who merely explained his legal rights but specifically refused to enter into an attorney-client relationship with him. We held that this procedure was inadequate to comply with the *Miranda* guarantees.

to counsel at other earlier stages of prosecution and investigation.[7]

The Military Rules of Evidence offer little guidance. Mil.R.Evid. 305 defines "[i]nterrogation" as "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." A noted text states:

> It is clear that not every encounter between an investigator and another individual must be preceded by rights warnings; they are only required before interrogation of a suspect or accused by individuals required to give the warnings. The terms "suspect" and "accused" are not defined in the Rule but military cases have applied a two-pronged subjective-objective test in determining whether an individual was a suspect when questioned.

S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 92 (1981). The Drafters' Analysis of Rule 305 includes these remarks:

> Rule 305(d)(1)(B) codifies the Supreme Court's decisions in *Brewer v. Williams*, 430 U.S. 387 [97 S.Ct. 1232, 51 L.Ed.2d 424] (1977) and *Massiah v. United States*, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] (1964). As modified by *Brewer*, *Massiah* requires that an accused or suspect be advised of his or her right to counsel prior to interrogation, whether open or surreptitious, if that interrogation takes place after either arraignment or indictment. As the Armed Forces lack any equivalent to those civilian procedural points, the initiation of the formal military criminal process has been utilized as the functional equivalent. Accordingly, the right to counsel attaches if an individual is interrogated after preferral of charges or imposition of pretrial arrest, restriction or confinement. The right is not triggered by apprehension or temporary detention. Undercover investigation prior to the formal beginning of the criminal process will not be affected by this, but jailhouse interrogations will generally be prohibited.

Appendix 18, Manual, *supra*.

■■■ I conclude that there is nothing in the Constitution, the Uniform Code of Military Justice, Federal case law, or our own cases that would recognize a right to have counsel provided upon request to a person who is merely waiting to be interviewed about a suspected crime. I hold that, in accordance with well-settled law, the right to *appointed* counsel arises first upon advisement of rights prior to in-custody interrogation.

The law requires balancing the accused's rights against self-incrimination and the rights of the Government to investigate and prosecute violations of criminal law. The amendments to the Constitution and judicial interpretations thereof, and the Uniform Code and judicial interpretations thereof, represent attempts to insure that the power of the state does not overwhelm a person accused or suspected of a crime. On the other hand, the suspected person must assert his rights, particularly at those critical points where the rights arise. If the investigator here had been informed of the earlier requests for counsel—and there is a conflict in the evidence that he had—then he should have discussed the matter more fully with the accused. However, the accused also had an obligation to renew his request at the proper time. The accused himself admitted that the investigator already knew everything because one of his confederates had already made "a three-hour statement" and "told everything." At that point, he reasonably may have concluded that counsel would be of little value to him. It is unrealistic to require that police investigators be alert and respond to every request made by a suspect under investigation. To exclude evidence taken after the proper advisement of rights and the waiver of those rights solely because a person, at some earlier point to another person, had requested counsel would un-

---

7. *See United States v. Tempia, supra; cf. United States v. Winberley*, 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966); *United States v. Gunnels*, 8 U.S.C. M.A. 130, 23 C.M.R. 354 (1957).

duly penalize the Government and the society it represents in a criminal prosecution.

The decision of the United States Army Court of Military Review is affirmed.

FLETCHER, Judge (concurring in the result):

*See* my opinion in *United States v. Hill*, 5 M.J. 114, 117 (C.M.A. 1978).

EVERETT, Chief Judge (dissenting):

I

Before receiving pleas, the military judge held a hearing on a defense motion to suppress "all statements given by the accused subsequent to his initial request for counsel." Sergeant Faron R. Slye, the first government witness on this motion, testified that, in performing his duties as a military policeman, he had been involved in the apprehension of appellant in the early morning hours of February 28, 1981. He

> was a back-up unit, rendering assistance to a unit who had a vehicle stopped in the Swan Creek area of Aberdeen Proving Grounds, Maryland. They had, I think, nine suspects who were suspected of possessing marijuana and/or drugs.

Slye had "searched ... [appellant] for weapons" and had "found a suspected marijuana cigarette and I think two types of suspected dangerous drugs." From the Swan Creek area, the accused and the other suspects had been transported to the MPI office, where he remained "[u]ntil approximately eleven o'clock the next day." After reaching the MPI office, Goodson had been "released from his handcuffs" and stayed "both standing and sitting" with some of the other suspects.

Slye had some conversation with Military Police Investigator Dennis Allinder, who until 8:30 a.m. was the only investigator present and was handling the investigation all by himself. Slye testified: "I had talked to the accused and he told me that he requested a lawyer several times and each time I informed Investigator Allinder that the guy requested a lawyer." This

sequence of events occurred "[a]pproximately three times."

Appellant had been brought to the office about 2:00 a.m. and had first asked for a lawyer about 15 minutes later. Slye testified: "He said that he didn't want to make a statement; that he requested a lawyer. I said, fine, I will relay this information, this message, to the investigator." Sergeant Slye did not ask Goodson for a statement, but he did seek to obtain information to complete a "field interview worksheet," which "consists of questions in regards to full name, your rank, your Social Security Number, your date of birth and place of birth." At that time appellant asked for a lawyer again, and Slye brought this to Allinder's attention.

Once again—"early in the morning" when "[i]t was starting to get daylight out"—Goodson "asked me [Slye] was he going to get a lawyer, and I said I had relayed the information on to Investigator Allinder and I told Investigator Allinder that Specialist Goodson wanted a lawyer and at this time he said he knew he needed a lawyer and was trying to catch up on the paperwork." However, up to this point appellant had not been questioned or read his rights, and with the other suspects he was "kept down the hallway just sitting in chairs" while "[w]aiting to be interviewed by Investigator Allinder." Slye had never seen Goodson before that night; but on this occasion he had more contact with him than with any of the other suspects.

Investigator Allinder had spoken with Goodson and the other suspects at about 2:30 a.m. at the Swan Creek area. This conversation consisted of Allinder's identifying himself as an investigator and explaining to the nine suspects "that they were all under apprehension for the charges" and that "they would be transported to Building 2004 for processing." According to Allinder, they reached that building—where the military police office was located—at about 2:45 a.m.; but he did not interview Goodson until about 9 hours later. In the interval, he interviewed six of the other suspects.

Allinder did not recall anyone stating to him that Goodson had requested counsel, and he commenced his interview of appellant by advising him of his rights on a DA Form 3881—a "Rights Warning Procedure/Waiver Certificate." After being so advised, Goodson never indicated that he wanted to see a lawyer or wished to remain silent; and he did not reveal that previously he had requested counsel. Goodson, after being warned, made a verbal statement to Allinder. Special Agent Robert Tilghman of the Criminal Investigation Division, and Specialist Four John Tivalt, another military police investigator, offered testimony corroborating Allinder's account that he had not been notified of Goodson's request for counsel.

Appellant testified on the motion to suppress that, after being apprehended and "strip-searched," he had asked Sergeant Slye for a lawyer and Slye "said he didn't know any and he talked to" Allinder. Then Slye told Goodson "to go back and sit down in the hallway," and "he told me I couldn't have one." After about 10 or 15 minutes, appellant "went and asked to call and Investigator Allinder, he told me that the acting JAG on duty was just for their use only and I couldn't use him."

Goodson remained seated in the hall and was able to overhear the discussions taking place between the investigators and other suspects, since "[t]he majority of the time the hallway door was left open so we could hear." When Allinder finally called him in, "[h]e already knew everything"; and Goodson gave an oral statement. He did not renew his request for a lawyer, because "I didn't think I would get one"; counsel "was already denied to me, two or three times." On the following Monday afternoon, appellant was called to the office of his company commander, Captain Fox; then he did not ask for a lawyer or remain silent, because "I thought I was already hung, sir, I just didn't stand a chance because they already knew." The statement he gave Captain Fox was more or less like the verbal statement he already had given Allinder.

After hearing the evidence and argument on the motion to suppress, the judge made various findings. Among them was a finding that, while waiting to be interviewed, Goodson had "requested to see a lawyer and permission to call a lawyer approximately three times in the first two hours," but "[h]e was told that he could not see a lawyer ... and that the on-duty JAG officer could not be called by" him. The judge made no finding as to whether Sergeant Slye had informed Allinder of appellant's request or whether Allinder otherwise knew of the request. However, he made this further finding that is especially significant:

> [I]n relation to the 28th of February, ... the accused's initial request for a lawyer made soon after he was brought to the station to talk to a lawyer was not made at a time when he had full knowledge of his rights and was not due to any interrogation whatsoever. It is not uncommon for one arrested to want to see a lawyer, but the state of the law does allow the government to inform the accused of his rights and then ask if he understands them. Once ascertaining the suspect understands his rights, the next question is to whether he wants a lawyer present. The accused had his opportunity at that point when questioned by Agent Allinder to state that he did want an attorney and that would require the government to suspend any further questioning. In this case the accused, after being informed of his rights completely and for the first time by MPI Agent Allinder at approximately 1200 hours, he consciously elected not to demand a lawyer and waived his rights. Therefore the statement taken by MPI Agent Allinder was voluntarily and intelligently given by the accused with full knowledge of his rights.

## II

The principal opinion now concludes—as did the military judge at trial and the Court of Military Review—that a request for counsel may be ignored unless it is made after in-custody interrogation has begun

and the warning required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has been given. I, however, am unable to subscribe to this restrictive interpretation of the applicable Supreme Court precedents.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court reversed the Arizona Supreme Court, which had "misunderstood the requirement for finding a valid waiver of the right to counsel, once invoked." While reaffirming that, "after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation," the Court held

> that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (emphasis supplied; footnote omitted).

In *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), Justice Rehnquist reaffirmed the *Edwards* principle that once an accused has "expressed his desire to deal with the police only through counsel," he "is not subject to further interrogation by the authorities until counsel has been made available to him,

unless the accused himself initiates further communication, exchanges, or conversation with the police." 103 S.Ct. at 2834, quoting 451 U.S. at 484–85, 101 S.Ct. at 1884–85. He concluded, however, that an inquiry by the accused—"Well, what is going to happen to me now?" (*id.*)—had "initiated" further conversation.

Justice Marshall's dissent, in which three other Justices joined, accepted fully the premise that, after an accused has requested counsel, he may not be interrogated in the absence of counsel or invited to waive his right to counsel, unless he has "initiated" a further discussion with the police. However, the dissenters concluded that the defendant's question had not constituted the "initiation" of a generalized discussion of the subject matter of the criminal investigation. Of course, the concurring opinion of Justice Powell—to which the principal opinion in this Court adverts—represented the position of only one Justice; and apparently it differed from the two-step analysis subscribed to by the other eight Justices.

In explaining the significance of a request for counsel, the Justices made no distinction in *Bradshaw* or in *Edwards* between requests that preceded interrogation and those made after interrogation had commenced. However, the principal opinion creates such a distinction out of whole cloth. Under its view, it would make no difference how often Goodson requested counsel *before* the custodial interrogation began. Furthermore, whether Allinder "had been informed of the earlier requests for counsel" would seem immaterial—although my Brother Cook says that, in this event, the investigator "should have discussed the matter more fully with the accused." * 18 M.J. 243, 249.

---

\* According to the principal opinion: "If the investigator here had been informed of the earlier requests for counsel—and there is a conflict in the evidence that he had—then he should have discussed the matter more fully with the accused. However, the accused also had an obligation to renew his request at the proper time." 18 M.J. 243, 249. I am uncertain about the logical basis for imposing on Allinder any obligation to discuss with Goodson his request for

counsel, since elsewhere the principal opinion seems to treat this request as immaterial because it was premature. If, however, the investigator had any obligation to discuss the matter with appellant, then the principal opinion should order a hearing to determine whether Allinder had, in fact, been informed of the three requests by appellant for counsel. *See United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). Furthermore, why Goodson "had

I simply cannot interpret the controlling precedents so narrowly. Perhaps, as the judge intimated in his further finding, a request for counsel immediately after apprehension should not be viewed as precluding interrogation later after a *Miranda* warning has been given. In that situation, the request for counsel might be construed only as an effort to obtain legal advice about the consequences of the apprehension and not to seek advice about an interrogation that may not be imminent or even in prospect.

However, when, as here, a group of suspects are being held for many hours for the express purpose of interrogation, I believe that to give no effect to a request for counsel conflicts with *Bradshaw* and *Edwards*. Furthermore, one of Goodson's three requests for counsel was a reaction to Sergeant Slye's seeking information for the "field interview worksheet." The questions on this "worksheet" concerned neutral subjects, like rank, Social Security number, and age; and so they may have fallen outside the purview of Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, and the fifth amendment. *Cf. California v. Byers*, 402 U.S. 424, 432, 91 S.Ct. 1535, 1540, 29 L.Ed.2d 9 (1971) (plurality opinion); *United States v. Davenport*, 9 M.J. 364, 369 (C.M.A. 1980). Nonetheless, when a suspect is in custody and is asked questions by his captors—no matter how neutral—a request for counsel generally should be viewed as directed also to any later questioning while he is still in custody. Indeed, if a suspect asks for legal advice to answer questions about innocuous matters like his age, his request would seem also to encompass legal advice about more incriminating matters.

To accept the narrow interpretation of *Edwards* employed by the Court of Military Review invites abuse. After a suspect who awaits interrogation has repeatedly been denied the counsel he has requested, he may well conclude—just as Goodson

claims he did—that any later mention by an investigator of his right to counsel is only a sham. Indeed, an investigator seeking to obtain a statement from a suspect would have incentive to ignore repeated requests for counsel before giving a *Miranda* warning and commencing interrogation. In this way, the investigator induces a belief on the suspect's part that it will be futile to request a lawyer; and so, when the *Miranda* warning finally is given, the suspect will fail to request a lawyer.

The principal opinion comments that, since "the right to appointed counsel does not arise until in-custody interrogation has begun[,] [t]he corollary is that a waiver of the *Miranda* rights cannot occur unless there has been a full advisement of rights." 18 M.J. at 247. This may be true; but even if a waiver of *Miranda* rights cannot proceed without full advisement of those rights, this does not mean that a request for counsel which precedes this advice can be ignored, as was done here.

Finally, the distinction made by the principal opinion is an invitation to hairsplitting: If a suspect already knows he is entitled to a lawyer during custodial interrogation and requests counsel a moment before his *Miranda* rights are explained, he may thereafter be interrogated by the police without counsel, so long as the request is not repeated; but if the *Miranda* warning is given and then the suspect asks for a lawyer, interrogation must halt indefinitely. I cannot believe that important constitutional rights of an accused—like his right to remain silent or to have legal counsel—hinge on such fine temporal distinctions.

### III

In refusing to suppress Goodson's written statement to his company commander, Captain Fox, the trial judge proceeded on

an obligation to renew his request at the proper time" puzzles me. After being informed that he was being detained along with others for the purpose of interrogation and having made three

requests for counsel, Goodson already had made "his request at the proper time"; and the investigator should have paid some attention thereto. 18 M.J. at 249.

the premise that the earlier verbal statement to Allinder had been lawfully obtained. Thus, he had no occasion to make findings as to whether any illegality in taking the first statement would taint the second statement. Absent such findings, I certainly have no grounds at this time to conclude that the written statement to Captain Fox was admissible. Indeed, Goodson's testimony tends to show that the statement to his company commander was tainted.

Because receipt in evidence of the two pretrial statements made by appellant clearly affected the findings of guilty as to the Additional Charge and all of its specifications, I would reverse the decision of the Court of Military Review thereon.