UNITED STATES, Appellee,

v.

Clifton JONES, Private U.S. Army, Appellant.

No. 52,090.

CM 443520.

U.S. Court of Military Appeals.

Aug. 15, 1988.

For Appellant: *Captain David L. Carrier* (argued); *Lieutenant Colonel Arthur L. Hunt* and *Captain Martin B. Healy* (on brief); *Colonel Brooks B. La Grua* and *Major Stephen R. Dooley.*

For Appellee: *Captain John F. Burnette* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Byron J. Braun* (on brief); *Lieutenant Colonel Gary F. Roberson* and *Captain Andrew D. Stewart.*

## OPINION OF THE COURT

EVERETT, Chief Judge:

Appellant was tried at Fort Wainwright, Alaska, by a general court-martial composed of officer members on a charge of premeditated murder. He pleaded not guilty; but the court members convicted him of voluntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919; and sentenced him to a bad-conduct discharge as well as confinement and forfeiture of $450.00 pay per month for 7 years. The convening authority approved these results, and the Court of Military Review affirmed the findings and sentence. 19 M.J. 961 (1985). Subsequently, this Court granted two issues raised by appellant and specified a third issue. All three issues concern admissibility of pretrial statements made by Jones and evidence derived therefrom.[1]

---

1. The granted issues are:

I

WHETHER STATEMENTS MADE BY APPELLANT AND EVIDENCE DERIVED THEREFROM SHOULD HAVE BEEN SUPPRESSED.

II

WHETHER THE ARMY COURT OF MILITARY REVIEW PROPERLY REDUCED APPELLANT'S ARTICLE 31 AND MILITARY RULE OF EVIDENCE 305 RIGHTS BY CREATING A RULE WHICH MELDS THE "PUBLIC SAFETY EXCEPTION" OF *NEW YORK V.* *QUARLES* WITH THE "RESCUE DOCTRINE" OF *PEOPLE V. RIDDLE* BASED ON THE ARMY COURT'S LEGISLATIVE BALANCING OF SOCIAL COSTS AND BENEFITS.

(III) SPECIFIED ISSUE

IF THE EARLIER ADMISSIONS WERE OBTAINED IN VIOLATION OF ARTICLE 31, UNIFORM CODE OF MILITARY JUSTICE, DOES A SUBSEQUENT WARNING RENDER LATER STATEMENTS ADMISSIBLE [*SEE OREGON V. ELSTAD,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ].

## I

Shortly after midnight on June 2, 1982, appellant returned to his room and changed clothes. Then, as he left the room, he told his roommate, "I'm sorry Reed." Next, Jones went to the charge of quarters' desk, where he saw Specialist Four Jeffery S. Honacker and asked to see PFC Elizabeth Hope. Jones went to her door and knocked, awakening her. When she opened the door, appellant said, "I'm sorry, your friend is dead, your friend is dead."

Then he returned to Honacker and asked to talk. Ultimately, Jones told Honacker that "down by the airfield" he had "stabbed" someone—a man "who drove a red car." Also, he said that he had covered up the body with pine branches; and he asked Honacker to drive him to the body. As they started off-post, Honacker decided that they should first go see Sergeant Smalls, their supervisor. In turn, Smalls advised Honacker to go to the military police; and when Jones was told this, he agreed at once to do so.

Upon arrival at the military-police station, Honacker approached the desk sergeant, Specialist Four Terry Sjostrom, while appellant waited. Honacker told Sjostrom that someone had been "hurt out in the field." Thinking the injury was the result of some type of accident, Sjostrom asked for details, which Honacker indicated that Jones could supply. Appellant said, "He's hurt real bad. I think he's dying." Sjostrom asked "how"; and Jones replied, "I hurt him real bad." Thinking of horseplay, Sjostrom repeated his question, whereupon appellant said, "I stabbed him." Specialist Four Sjostrom immediately telephoned his supervisor and then the dispensary. Those with whom he talked at the dispensary asked about the nature of the wounds and the location of the victim; and Sjostrom relayed these questions to Jones. Jones answered that he had stabbed him "all over"; that the victim was "in the woods by the airfield"; and that he would have to take them there. Sjostrom, who thought that Jones was concerned about "getting medical attention" to the victim, did not advise him of his rights under Article 31(b) of the UCMJ, 10 U.S.C. § 831.

Captain Myers and Sergeant Perry, who were supervisors, arrived at the military-police station and were advised later by Sjostrom that appellant had stabbed someone and was willing to take them to the victim. Perry asked Honacker where the victim was; and Captain Myers then advised Perry to read appellant his rights and see if he was still willing to help them find the victim. When Sergeant Perry read him an Article 31 warning, appellant indicated that "he understood his rights" but did not want "to talk to a lawyer." When Sergeant Perry then asked "if he was willing to be questioned or say anything about the offense under investigation," Jones declined; but at the same time, "he stood up and" faced the door as if he wanted "to do something." Observing this, Sergeant Perry asked Jones if he was "willing to show" them "where the victim" was; and appellant said, "Yes, let's go."

Riding in a car with Captain Myers, Sergeant Perry, and a Sergeant Carroll, appellant "was agitated" but "very cooperative." He directed them to the place where the victim lay; and, upon arrival, he shouted, "Stop. Stop, it's over here," while pointing at a small hill. Myers and Perry followed a trail over the hill about 20 meters and found a pile of freshly cut pine branches, under which lay the body of PFC Terry Blount. They also discovered a large pool of blood in the road and along the trail to the body. Meanwhile, without questioning, Jones told Sergeant Carroll where the victim's car was located.

About 2 hours later, back at the military-police station, Jones was interviewed by Alaska State Trooper Corporal Robert Barnes and by Staff Sergeant Walsh of the military police. Neither knew that previously Jones had been advised of his Article 31 rights and had indicated that he did not wish to discuss the offense of which he was suspected. Appellant received warnings of his rights under Article 31 and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); but he immediately

waived those rights and answered questions freely. Appellant's statement was taken by State Trooper Barnes, who had Jones review and sign his notes. Jones informed them where he had disposed of the knife with which he had killed PFC Blount and also where he had disposed of his own clothes. These items were later retrieved and admitted in evidence at trial.

Appellant moved to suppress all statements made to Sjostrom and all the physical evidence that had been seized—namely, clothes, knife, car, and body. The defense contention was that, as soon as Specialist Four Sjostrom heard that someone was hurt, he should have given Jones an Article 31 warning. Moreover, according to the defense, his failure to do this tainted all later statements.

The military judge suppressed all statements made to Sjostrom after Jones said, "I stabbed him." However, he admitted the physical evidence and ruled that appellant's act of taking the military police to the body had been freed of any taint by the giving of the Article 31 warning to Jones. The judge also held that appellant's confession to the state trooper was admissible. Thus, the judge allowed admission of all evidence that had been obtained after Sergeant Perry gave Jones an Article 31 warning.

## II

The Court of Military Review took the position that Specialist Four Sjostrom had no duty to inform appellant of his rights under Article 31 because his interrogation of Jones fell within an exception to the warning requirements imposed by Article 31 of the Uniform Code of Military Justice and by *Miranda v. Arizona, supra.*[2] If this premise is correct, appellant has no basis to argue that the unwarned state-ments by Jones to Sjostrom tainted all the evidence obtained later.

Even before *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), was decided, various courts had recognized an exception to the *Miranda* warning requirements when a suspect was interrogated by the police for the primary purpose of saving a life or preventing harm to the public safety.[3] Then, in *Quarles,* a majority of the Justices specifically approved an exception in "a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656, 104 S.Ct. at 2632. Even though Justice O'Connor's concurring opinion and Justice Marshall's dissent in *Quarles* may seem persuasive, we are bound by the Supreme Court's interpretation of *Miranda.* Thus, we must apply the "public safety" exception in determining when warnings are constitutionally required in military interrogations.

Congress, however, is free to impose warning requirements even when they are not constitutionally mandated. Therefore, we must decide whether the legislators intended for the warnings required by Article 31(b) also to be subject to an implied exception when military investigators "ask questions reasonably prompted by a concern for the public safety." In seeking to ascertain congressional intent, our task is complicated by the circumstance that Article 31(b) came into effect some 15 years before *Miranda* was decided;[4] and, in drafting this provision, no one apparently foresaw or suggested the possible need for a "public safety" exception.

We observe that in his dissent in *Quarles,* Justice Marshall commented:

The irony of the majority's decision is that the public's safety can be perfectly well protected without abridging the Fifth Amendment. If a bomb is about to

---

**2.** In *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), this Court held that *Miranda* applied to military interrogations.

**3.** See cases cited by Judge Wold in his opinion in the court below at 19 M.J. 964–65 and annotation at 81 L.Ed.2d 990 (1986).

**4.** Indeed, Chief Justice Warren referred to Article 31(b) in seeking to justify the warning requirement being established by his opinion in *Miranda.*

explode or the public is otherwise imminently imperiled, the police are free to interrogate suspects without advising them of their constitutional rights. Such unconsented questioning may take place not only when police officers act on instinct but also when higher faculties lead them to believe that advising a suspect of his constitutional rights might decrease the likelihood that the suspect would reveal life-saving information. If trickery is necessary to protect the public, then the police may trick a suspect into confessing. While the Fourteenth Amendment sets limits on such behavior, nothing in the Fifth Amendment or our decision in *Miranda v. Arizona* proscribes this sort of emergency questioning. All the Fifth Amendment forbids is the introduction of coerced statements at trial.

*Id.* at 686, 104 S.Ct. at 2647–48. If even Justice Marshall, a leading exponent of *Miranda,* accepts the proposition that neither the Fifth Amendment nor *Miranda* prohibits some types of emergency questioning, it seems unlikely that Congress would have intended for Article 31(b) to be construed to prohibit such questioning. This inference seems especially valid, since otherwise a servicemember who has asked questions in order to protect the public safety might be exposing himself to criminal prosecution under Article 98 of the Uniform Code, 10 U.S.C. § 898, for violation of procedural rules.

Moreover, as Judge Wold reasoned in his opinion for the court below, the same policy concerns that underlie the holding in *Quarles* that a "public safety" exception exists to the *Miranda* warning requirements suggest that a similar exception be implied in interpreting Article 31(b). Of course, Congress undoubtedly would have desired that this exception be narrowly construed, so that it would apply only when life is endangered and not in the usual criminal investigation.

### III

As we understand *Quarles,* the "public safety" exception does not make admissible a statement that was truly involuntary. Likewise, Article 31(a) prohibits admission in evidence of a statement obtained "through the use of *coercion,* unlawful influence, or unlawful inducement" (emphasis added), and we perceive no exceptions to this prohibition. Accordingly, if appellant's statements to Sjostrom were "coerced," they were inadmissible—even if Sjostrom coerced them for the laudable purpose of saving the life of someone whom he thought was severely wounded.

Accordingly, after Jones became a "suspect," the statements he made to Sjostrom were inadmissible, unless the military judge determined (1) that they fell within the "public safety" exception to the Article 31(b) warnings requirement and (2) that they were voluntary. Moreover, even though omission of the Article 31(b) warnings might be excused by the "public safety" exception, it would still be a factor to be considered by the judge in determining the voluntariness of these statements.

The military judge had no occasion to determine whether the "public safety" exception excused Sjostrom's failure to give an Article 31(b) warning to appellant, because the Government never relied on this exception at trial. Likewise, having decided that these statements were inadmissible because they were unwarned, the judge had no occasion to inquire whether they were voluntary. We could, of course, remand the case for a *DuBay* hearing [5] in order for these determinations to be made by a military judge at the trial level. However, as our later discussion will make clear, this remedy is unnecessary; instead, we shall assume for present purposes that all statements made to Sjostrom after Jones said "I stabbed him" were inadmissible because they were unwarned.

### IV

Appellant contends that, if the statements to Sjostrom were inadmissible,

5. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

they created a presumptive taint as to statements made later by Jones to Sergeant Perry and others and that this taint was never removed by subsequent Article 31(b) warnings or otherwise. We shall assume *arguendo* that appellant's statements to Sjostrom did create a presumptive taint as to statements or physical evidence obtained thereafter. Moreover, we recognize that a warning of the rights granted by *Miranda* and under Article 31(b) may not provide complete insulation from any presumptive taint created by an unwarned or coerced statement.[6]

██ However, even when a statement is clearly involuntary and therefore presumptively taints later statements, the presumption may be rebutted. *United States v. Wimberley,* 16 U.S.C.M.A. 3, 9, 36 C.M.R. 159, 165 (1966); *United States v. Monge,* 1 U.S.C.M.A. 95, 2 C.M.R. 1 (1952); *see United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). In *Monge,* the accused's fellow soldiers suspected him of barracks larceny; and they "pulled him from his bed" at about 4:00 a.m., "forced him to lie on the floor, held a bayonet at his back, and questioned him concerning the thefts. A military policeman was present during the questioning." While one soldier asked questions, another searched Monge's clothes "and found a large sum of money. After several questions," he "finally admitted that he had stolen the money." About 3:30 that afternoon, Monge was examined by an agent of the Criminal Investigation Division and "warned ... that he need make no statement and that anything he might say could be used against him"; but he was not "told that any prior involuntary confession could not be used against him." 1 U.S.C.M.A. at 96, 2 C.M.R. at 2. He made a confession which was later received in evidence at his trial.

In ruling that this confession was admissible, this Court refused to hold that the presumptive taint of an unwarned confession can only be removed by warning the suspect that his confession cannot be admitted in evidence against him. *See also United States v. Wimberley, supra.* In this connection, the Court quoted[7] these comments of the Supreme Court in *United States v. Bayer, supra* 331 U.S. at 540–41, 67 S.Ct. at 1398:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantage of having confessed. He can never get the cat back in the bag.... In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under [the] circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

As this Court explained[8]:

The question remains one of fact. We may say, legally, that the prior improper influences are "presumed to continue," or we may state, practically, that the effects naturally linger in the accused's mind and that this becomes another factor—to be sure, a weighty one—in deciding whether the subsequent confession was, in fact, involuntary. It is deceptive to say that the prosecution must establish that the improper influences have been dissipated. The continuing effect of the coercive practices must still be determined from all the circumstances. There must be considered, among other things, the mental character of the accused, the nature and degree of the influence, the time intervening between the confessions, and all the circumstanc-

---

**6.** The specified issue in this case poses the question of the significance of a rights' warning given after an admission has been obtained in violation of Article 31(b). *Cf. Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). A similar issue was argued recently in

*United States v. Ravenel,* 26 M.J. 344 (C.M.A.1988).

**7.** 1 U.S.C.M.A. at 98, 2 C.M.R. at 4.

**8.** *Id.* at 99, 2 C.M.R. at 5.

es surrounding the subsequent confession in deciding whether the accused possessed that mental freedom required to make the confession voluntary.

■ The military judge determined that all statements made by appellant after Sergeant Perry had warned him of his rights were voluntary and untainted by the earlier unwarned statements to Sjostrom, which the judge had suppressed. The record of trial reveals that an ample basis existed for this determination. The giving of the warning is a factor; but there are other circumstances of equal significance.

The most important is that, before talking to Sjostrom, Jones had already made some very incriminating statements to Hope and Honacker. These statements were clearly admissible, *cf. United States v. Duga*, 10 M.J. 206 (C.M.A.1981). Thus, the cat was already out of the bag before appellant talked to Sjostrom or to Perry; and, in light of the admissions that he already had made, Jones undoubtedly would have believed it was futile to have exercised his right of silence or the right to counsel.[9]

■ Furthermore, appellant's earlier admissions to Hope and Honacker, along with the other circumstances, make it perfectly clear that—whether because of remorse, guilt, or for some other reason—Jones wanted to talk about the stabbing with anyone who would listen to him. When a suspect already has revealed his strong desire to confess the commission of a serious crime and has been warned of his right to remain silent and have a lawyer, an ensuing statement may properly be admitted into evidence. *Cf. United States v. Vogel*, 18 U.S.C.M.A. 160, 39 C.M.R. 160 (1969).

## V

Appellant insists, however, that, after being warned by Sergeant Perry, he invoked his right to remain silent but nonetheless was requested to make a statement. That statement was in the form of a "verbal act"—namely, leading investigators to the location of the victim's body.

■ We have no doubt that asking Jones to take investigators to the place where the body was located constituted a request for a "statement" within the meaning of Article 31(b) and "interrogation" for purposes of *Miranda*. *Cf. United States v. Pyatt*, 22 U.S.C.M.A. 84, 46 C.M.R. 84 (1972); *United States v. Corson*, 18 U.S.C.M.A. 34, 39 C.M.R. 34 (1968); *United States v. Vail*, 11 U.S.C.M.A. 134, 28 C.M.R. 358 (1960); *United States v. Nowling*, 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958); *United States v. Taylor*, 5 U.S.C.M.A. 178, 17 C.M.R. 178 (1954). Accordingly, if Jones, after being warned by Sergeant Perry, had requested a lawyer, no further "interrogation" could have taken place and no request for a "statement" could have been made unless appellant "initiated" further discussion. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *United States v. Goodson*, 18 M.J. 243 (C.M.A.1984), *remanded*, 471 U.S. 1063, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985), *on remand*, 22 M.J. 947 (A.C.M.R.1986).

■ However, in applying *Miranda*, the Supreme Court has differentiated between asking for a lawyer and asserting the right to remain silent. The former precludes any further questioning; but the latter is less restrictive. *Cf. United States v. Muldoon*, 10 M.J. 254, 256 (C.M.A.1981); *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Although a suspect's assertion of his right to remain silent must be "scrupulously honored," investigators are not perpetually precluded from interrogating him. 423 U.S. at 104, 96 S.Ct. at 326.

---

9. Likewise, appellant must also have been aware that in the normal course of events incriminating physical evidence would soon come to the attention of investigators. Indeed, some of the physical evidence which appellant has sought to suppress might be admissible under the doctrine of "inevitable discovery." *United States v. Kozak*, 12 M.J. 389 (C.M.A.1982); *see Nix v. Williams*, 467 U.S. 431, 440–48, 104 S.Ct. 2501, 2507–11, 81 L.Ed.2d 551 (1984).

Jones did not request counsel; but he did decline to be questioned. If this action on his part constituted assertion of his right to remain silent, then investigators were required to "scrupulously" honor that right.

In this connection, we observe that, when Jones said he was not willing to be questioned, he "simultaneously" stood up. Under the circumstances then prevailing, this conduct was

> subject to a number of interpretations. The most compelling and logical interpretation is that appellant did not want to take the time to make a statement but rather wanted to get aid to the victim. Appellant had already demonstrated his concern about assisting the victim. He initiated the contact with the police, volunteered the information that a person was injured, and expressed concern that aid be rendered.[10]

This "interpretation" of appellant's actions is consistent with the evidence. In light of appellant's earlier confessional behavior, we also are satisfied that he de-

---

**10.** *See* opinion below, 19 M.J. at 968.

clined a lawyer and asked to remain silent in order that he and the investigators might proceed promptly to the place where the victim's body was located. Since Jones was not seeking to exercise his right of silence, neither the Constitution nor Article 31 was violated when he took the investigators out to the victim's body. Consequently, the body—as well as other physical evidence obtained later—was admissible in evidence at appellant's trial.

## VI

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN did not participate.

COX, Judge (concurring):

I concur with the principal opinion. I write only to make it clear that I also agree with the excellent opinion of Senior Judge Wold below. *See United States v. Jones*, 19 M.J. 961 (A.C.M.R.1985). Our resolution leaves open the "public safety" question until another day.